**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 11 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

NEW MEXICO CATTLE GROWERS
ASSOCIATION; NEW MEXICO CATTLE
GROWERS ASSOCIATION, a nonprofit
organization; NEW MEXICO PUBLIC
LANDS COUNCIL, a nonprofit corporation;
NEW MEXICO WOOL GROWERS, INC., a
nonprofit corporation; NEW MEXICO FARM
AND LIVESTOCK BUREAU, a nonprofit
corporation; NEW MEXICO WHEAT
GROWERS ASSOCIATION, a non profit
corporation; COALITION OF
ARIZONA-NEW MEXICO COUNTIES FOR
STABLE ECONOMIC GROWTH, a nonprofit
organization; HIDALGO COUNTY CATTLE
GROWERS ASSOCIATION, a nonprofit
organization, on behalf of themselves and
their members; PRODUCTION CREDIT
ASSOCIATION OF NEW MEXICO,

        Plaintiffs - Appellants,

    v.

UNITED STATES FISH AND WILDLIFE
SERVICE, an Agency of the United States
Department of Interior; GALE A. NORTON,[*]
Secretary of the United States Department of
the Interior; JOHN ROGERS, United States
Fish and Wildlife Service Director and Fish
and Wildlife Service Regional Director;

No. 00-2050

---

[*]Pursuant to Fed. R. App. P. 43(c)(2), Gale A. Norton is substituted for
Bruce Babbitt, Secretary of the Interior, as a defendant in this action.

NANCY KAUFMAN, Southwest Regional
Director, United States Fish and Wildlife
Service,

Defendants - Appellees.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D. Ct. No. CIV-98-275-LH)**

Marc R. Stimpert (Karen Budd-Falen and John M. McCall, with him on the
briefs), Budd-Falen Law Offices, P.C., Cheyenne, Wyoming, appearing for
Appellants.

Katherine J. Barton, United States Department of Justice, Environment & Natural
Resources Division, Appellate Section, Washington, DC (Lois J. Schiffer,
Assistant Attorney General, John A. Bryson, and Jean E. Williams, United States
Department of Justice, Environment & Natural Resources Division, Appellate
Section, Washington, DC; John W. Zavitz, Assistant United States Attorney,
Albuquerque, New Mexico; Benjamin Jesup, United States Department of the
Interior, Office of the Solicitor, Washington, DC, and Janet Spaulding, United
States Department of the Interior, Office of the Solicitor, Albuquerque, New
Mexico, with her on the brief), appearing for Appellees.

Before **TACHA**, Chief Judge, **KELLY**, Circuit Judge, and **LUNGSTRUM**,[†]
District Judge.

**TACHA**, Chief Circuit Judge.

The New Mexico Cattle Growers Association, New Mexico Farm &

---

[†]Honorable John W. Lungstrum, Chief District Judge for the District of
Kansas, sitting by designation.

Livestock Bureau, New Mexico Wool Growers, Inc., New Mexico Wheat Growers Association, New Mexico Public Lands Council, Albuquerque Production Credit Association, Coalition of Arizona/New Mexico Counties for Stable Economic Growth, and Hidalgo County Cattle Growers Association (collectively "Appellants") all represent, in some fashion, elements of New Mexico's agricultural industry. Appellants appeal an order of the district court dismissing their suit against Appellee U.S. Fish & Wildlife Service ("FWS"). We exercise jurisdiction pursuant to the Administration Procedures Act ("APA"), 28 U.S.C. §§ 701-06, and reverse.

I.

The Southwestern Willow Flycatcher ("flycatcher"), empidonax traillii extimus, is one of four sub-species of the willow flycatcher, a small bird that nests in riparian areas along river beds. On July 23, 1993, the FWS published its "Proposed Rule to List the Southwestern Willow Flycatcher as Endangered With Critical Habitat." 58 Fed. Reg. 39495. On February 27, 1995, the FWS issued its "Final Rule Determining Endangered Status for the Southwestern Willow Flycatcher." 60 Fed. Reg. 10694. The Final Rule listed the flycatcher as endangered, but deferred the critical habitat designation ("CHD") in order to gather more information. However, the FWS did not, on its own initiative, move forward with the CHD for the flycatcher.

On March 20, 1997, the U.S. District Court for the District of Arizona, in the case Southwest Ctr. for Biological Diversity v. Babbitt, Civ. No. 96-1874-PHX-RGS (D. Ariz. March 20, 1997), ordered the FWS to complete the CHD for the flycatcher within 120 days. Pursuant to the court order, the FWS issued its CHD for the flycatcher on July 22, 1997. At that time, the known population of the flycatcher was between 300 and 500 nesting pairs spread across seven states and parts of Mexico. The CHD designated eighteen critical habitat units, including four in New Mexico, totaling 599 miles of stream and river beds.

The Endangered Species Act ("ESA"), which controls CHDs, requires the FWS to perform an economic analysis of the effects of the CHD before making a final designation. 16 U.S.C. § 1533(b)(2). In order to determine what the "economic impact" of a CHD will be, the FWS has adopted an incremental baseline approach (the "baseline approach"). The baseline approach utilized by the FWS is premised on the idea that the listing of the species (which will occur prior to or simultaneously with the CHD) will have economic impacts that are not to be considered. The primary statutory rationale for this position comes from 16 U.S.C. § 1533(b)(1)(A), which states that listing determinations be made "solely on the basis of the best scientific and commercial data available." Thus, the baseline approach moves any economic impact that can be attributed to listing below the baseline and, when making the CHD, takes into account only those

economic impacts rising above the baseline. Using the baseline approach, the FWS determined that the flycatcher CHD resulted in no economic impact, stating that "[c]ritical habitat designation will . . . result in no additional protection for the flycatcher nor have any additional economic effects beyond those that may have been caused by listing and by other statutes." Division of Economics, U.S. Fish and Wildlife Service, Economic Analysis of Critical Habitat Designation for the Southwestern Flycatcher, S3 (1997).

The appellants filed suit in district court in March 1998, challenging the flycatcher designation and alleging that the FWS had violated various provisions of both the ESA and the National Environmental Protection Act ("NEPA"). In August 1998, the FWS filed its administrative record ("AR") with the district court. The appellants objected that the AR was incomplete. The FWS responded that the AR was complete and refused to supplement it. The appellants proceeded to file their opening brief, and the FWS filed its response. Included with the FWS's response brief was an eleven-page declaration ("declaration") by Jamie Rappaport Clark, the Secretary of the FWS. Accompanying the declaration were approximately 77 pages of attachments.

The appellants objected to the introduction by the FWS of an extra-record document and characterized the declaration and its attachments as a post-hoc rationalization of the FWS's actions. The FWS characterized the declaration as

providing background information and an explanation of the AR. On December 21, 1999, the district court ruled the declaration and its attachments to be admissible and proceeded to rule on the merits in favor of the FWS on all counts. This appeal followed.

Specifically, the appellants make the following arguments on appeal: (1) that the FWS's adoption of the baseline approach to measuring the economic impact of the flycatcher CHD is an erroneous construction and, thus, a violation of the ESA; (2) that the district court erred in ruling the declaration and its attachments admissible; (3) that the FWS misapplied the critical habitat definition set forth in the ESA; (4) that the FWS violated NEPA by applying the baseline approach to the environmental impact analysis undertaken in the EA; (5) that the FWS failed to address adequate alternatives to the CHD pursuant to NEPA[1]; and (6) that the FWS, in making the flycatcher CHD, failed to properly cooperate with state and local agencies as required by NEPA. Because we rule in favor of the appellants on the first issue raised by holding that the baseline approach to

---

[1] On July 3, 1997, the FWS published its environmental assessment ("EA") of the CHD, which determines whether an environmental impact statement is necessary under the National Environmental Protection Act ("NEPA"). The EA analyzed three alternatives: (1) the proposed alternative; (2) an alternative designating more area; and (3) a "no action" alternative. Again, using the baseline approach, the FWS determined that there were no environmental impacts of the CHD above the listing baseline, and thus issued its finding of no significant impact ("FONSI") on October 16, 1997. Because the FWS made a FONSI, no environmental impact statement ("EIS") was made under NEPA.

economic impact analysis is not permitted by the ESA, thus setting aside the flycatcher CHD, we need not address any of the other issues raised.

II.

This case is before us on review pursuant to the APA. Our standard of review of the lower court's decision in an APA case is de novo. Sac & Fox Nation v. Norton, 240 F.3d 1250, 1260 (10th Cir. 2001). "[W]e owe no deference to the district court's decision." Id. When reviewing agency action, our scope of review is set forth in the APA. "[W]e cannot set aside an agency decision unless it fails to meet statutory, procedural or constitutional requirements, or unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id.; see 5 U.S.C. § 706(2)(A)-(D); see also, Publ. Lands Council v. Babbitt, 167 F.3d 1287, 1293 (10th Cir. 1999).

Normally, when the agency decision at issue involves interpretations of federal statutes, we owe deference to that decision as set forth in Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc., 467 U.S. 837, 842-43 (1984). Indeed, the district court in this case, applying Chevron deference to the FWS's use of the baseline approach, did not find it to be a violation of the ESA. The appellants, however, argue that Chevron deference is not applicable in this case. We agree.

The FWS concedes, in fact, that Chevron deference is not due the FWS's

use of the baseline approach in making CHDs. Because the statutory interpretation resulting in the baseline approach has never undergone the formal rulemaking process, it remains an informal interpretation not entitled to deference. Hunnicutt v. Hawk, 229 F.3d 997, 1000 (10th Cir. 2000) ("'Where the agency's interpretation of the statute is made informally, however, such as by a 'program statement,' the interpretation is not entitled to . . . deference.'" (quoting Fristoe v. Thompson, 144 F.3d 627, 631 (10th Cir. 1998))). Instead, we simply ask if the agency's interpretation is "well reasoned" and has the "power to persuade." Fristoe, 144 F.3d at 631 (quoting S. Ute Indian Tribe v. Amoco Prod. Co., 119 F.3d 816, 834 (10th Cir. 1997), overruled on other grounds by Amoco Prod. Co. v. S. Ute Indian Tribe, 526 U.S. 865 (1999)).

## III.

Our primary task in construing statutes is to "determine congressional intent, using 'traditional tools of statutory interpretation.'" NLRB v. United Food & Commercial Workers Union, 484 U.S. 112, 123 (1987) (quoting INS v. Cardoza-Fonseca, 480 U.S. 421, 446 (1987)). "As in all cases requiring statutory construction, 'we begin with the plain language of the law.'" St. Charles Inv. Co. v. CIR, 232 F.3d 773, 776 (10th Cir. 2000) (quoting United States v. Morgan, 922 F.2d 1495, 1496 (10th Cir. 1991)). "In so doing, we will assume that Congress's intent is expressed correctly in the ordinary meaning of the words it

employs. . . . Where the language of the statute is plain, it is improper for this Court to consult legislative history in determining congressional intent." Id. However, "if the statutory language is ambiguous, a court can then resort to legislative history as an aid to interpretation." United States v. Simmonds, 111 F.3d 737, 742 (10th Cir. 1997).

Enacted in 1973, the ESA, 16 U.S.C. § 1531 et seq., was the congressional response to increasing concern about the extent to which "various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation." 16 U.S.C. § 1531(a)(1). The stated purpose of the ESA is, in part, "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." Id. § 1531(b).

The process set forth in the ESA for the protection of endangered and threatened species and the conservation of their ecosystem begins by granting the Secretary of the Interior, through the FWS, authority to list species in need of protection as either endangered or threatened. Id. § 1533(a). The ESA enumerates the factors to be considered by the agency when making a listing decision, including "the present or threatened destruction, modification, or

curtailment of its habitat or range." Id. § 1533(a)(1). Further, the ESA specifically requires that the listing determination be based "solely on the basis of the best scientific and commercial data available." Id. § 1533(b)(1)(A). Thus, economic analysis is not a factor in the listing determination. Once a species is listed, all federal agencies are required to consult with the FWS to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." Id. § 1536(a)(2).

In addition to the protections afforded listed species by the ESA, the Act requires the agency to designate "critical habitat" for all listed species, to the extent determinable. Id. § 1533(a)(3). Critical habitat is defined as:

> (i) the specific areas within the geographic area occupied by the species, at the time it is listed . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and (ii) specific areas outside the geographic area occupied by the species at the time it is listed . . . upon a determination by the Secretary that such areas are essential for the conservation of the species.

Id. § 1532(5)(A). Thus, the CHD may include specific areas found both inside of and outside of the geographic area occupied by the species.

The CHD is required to be based on "the best scientific data available" considering "the economic impact, and any other relevant impact, of specifying any particular area as critical habitat." Id. § 1533(b)(2). The agency "may

exclude" a particular area from the CHD if the agency determines that "the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless . . . the failure to designate such area . . . will result in the extinction of the species concerned." Id. § 1533(b)(2). Once critical habitat is designated, federal agencies must consult with the FWS to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to . . . result in the destruction or adverse modification of [designated critical] habitat." Id. § 1536(a)(2). Thus, agency action that is prohibited is both (1) action that is likely to jeopardize the existence of a listed species and (2) action that is likely to result in the adverse modification of any area within a CHD.

The crux of the statutory dispute is in determining the meaning of "economic impact" in 16 U.S.C. § 1533(b)(2). The baseline approach adopted by the FWS utilizes a "but for" method for determining what economic impacts flow from the CHD. Thus, unless an economic impact would not result but for the CHD, that impact is attributable to a different cause (typically listing) and is not an "economic impact . . . of specifying any particular area as critical habitat." Conversely, the approach advocated by the appellants would take into account all of the economic impact of the CHD, regardless of whether those impacts are caused co-extensively by any other agency action (such as listing) and even if those impacts would remain in the absence of the CHD. The issue presented is a

question of first impression in this circuit and, to our knowledge, has not been decided by any of our sister circuits.

The root of the problem lies in the FWS's long held policy position that CHDs are unhelpful, duplicative, and unnecessary. Between April 1996 and July 1999, more than 250 species had been listed pursuant to the ESA, yet CHDs had been made for only two. S. Rep. No. 106-126, at 2 (1999). Further, while we have held that making a CHD is mandatory once a species is listed, Forest Guardians v. Babbitt, 174 F.3d 1178, 1186 (10th Cir. 1999), the FWS has typically put off doing so until forced to do so by court order. S. Rep. No. 106-126, at 2 (1999).

In turn, the policy position of the FWS finds its root in the regulations promulgated by the FWS in 1986 defining the meaning of both the "jeopardy standard" (applied in the context of listing) and the "adverse modification standard" (applied in the context of designated critical habitat). Action violating the jeopardy standard is action reasonably expected "to reduce appreciably the likelihood of both the survival and recovery of a listed species." 50 C.F.R. 402.02. Action violating the adverse modification standard is action "that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species." Id. Thus, the standards are defined as virtually identical, or, if not identical, one (adverse modification) is subsumed by the other

(jeopardy).  See Am. Rivers v. Nat'l Marine Fisheries Serv., 1999 U.S. App.

LEXIS 3860 *5 (9th Cir. Jan. 11, 1999) (agreeing with the agency that

"'jeopardy' and 'critical habitat' . . . are 'closely related,' and [thus] the jeopardy

discussion properly 'encompasses' the critical habitat analysis").  While these

regulatory definitions are not before us today, they have been the cause of much

confusion in that they inform the FWS's interpretation of the ESA's economic

impact language.[2]

Consistent with its long standing position, the FWS argues in the instant

case that the impacts of the flycatcher listing and the flycatcher CHD are co-

extensive.  The FWS stated in its economic analysis that, because all actions "that

result in adverse modification of critical habitat will also result in a jeopardy

decision, designation of critical habitat for the flycatcher is not expected to result

in any incremental restrictions on agency activities."  Division of Economics,

U.S. Fish and Wildlife Service, Economic Analysis of Critical Habitat

Designation for the Southwestern Flycatcher, S3 (1997).  The CHD itself states

that "[c]ommon to both [the jeopardy standard and the adverse modification

---

[2]  Though these regulatory definitions are not before us today, federal courts have begun to recognize that the results they produce are inconsistent with the intent and language of the ESA.  See, e.g., Sierra Club v. U.S. Fish and Wildlife Service, 245 F.3d 434 (5th Cir. 2001) (holding that the adverse modification standard of 50 C.F.R. 402.02 is inconsistent with the ESA).

standard] is an appreciable detrimental effect on both survival and recovery of a listed species," and thus "actions satisfying the standard for adverse modification are nearly always found to also jeopardize the species concerned, and the existence of a critical habitat designation does not materially affect the outcome of consultation." 60 Fed. Reg. 39,131 (July 22, 1997). Moreover, the FWS continues to assert that agency action that is "likely to adversely modify critical habitat but not to jeopardize the species for which it is designated are extremely rare historically, and none have been issued in recent years." Appellee's Brief at 31.

However, as we have previously said, the fact that the FWS says that no real impact flows from the CHD does not make it so. Catron County Bd. of Comm'rs v. United States Fish & Wildlife Serv., 75 F.3d 1429, 1436 (10th Cir. 1996) ("[W]e disagree with the [Ninth Circuit] that no actual impact flows from the critical habitat designation. Merely because the Secretary says it does not make it so. The record in this case suggests that the impact will be immediate and the consequences could be disastrous."). Because Catron County dealt with whether an environmental impact statement had to be prepared pursuant to NEPA when the FWS made a CHD, the court was dealing specifically with the environmental impacts of the CHD rather than its economic impacts. However, our holding in that case casts doubt on the FWS's position in this case.

In fact, the district court in this case, by granting the appellants standing to challenge the CHD, implicitly acknowledged that they have been impacted by the flycatcher CHD. N.M. Cattle Growers Ass'n v. United States Fish & Wildlife Serv., 81 F. Supp. 2d 1141, 1153 (D.N.M. 1999) (holding that the appellants had alleged an injury in fact flowing from the flycatcher CHD).[3] If none of the impacts of the CHD are actually attributable to the CHD, the district court's standing decision is rendered incoherent. If the injury alleged is attributable wholly to listing, then the appellants suffer no injury from the CHD, and cannot establish standing to challenge it. The district court's standing determination further points to the inconsistency between the policy position of the FWS and the language of the ESA itself. But the question of whether the impacts of listing and a CHD are co-extensive is not the precise question before us. Rather, the question is whether the FWS must analyze all of the economic impacts of critical habitat designation (regardless of whether the impacts are co-extensive with other causes), or only those impacts that are a 'but for' result of the CHD.

It is true that the ESA clearly bars economic considerations from having a

_____

[3] For example, the district court found that the plaintiffs had alleged and substantiated that because of the CHD, "fencing has been erected and continues to be erected on both sides of the length of the Tularosa and San Francisco Rivers. . . . Due to the fencing, [a rancher] has been forced to reduce the size of his herd . . . [and] the fencing limits his access to river water which causes his significant inconvenience and financial harm." N.M. Cattle Growers Ass'n, 81 F. Supp. 2d at 1153.

-15-

seat at the table when the listing determination is being made. "The addition of the word 'solely' is intended to remove from the process of the listing or delisting of species any factor not related to the biological status of the species. . . . [E]conomic considerations have no relevance to determinations regarding the status of species." H.R. Rep. No. 97-567, pt. 1, at 29 (1982), reprinted in 1982 U.S.C.C.A.N. 2807. However, Congress clearly intended that economic factors were to be considered in connection with the CHD. 16 U.S.C. § 1533(b)(2).

The statutory language is plain in requiring some kind of consideration of economic impact in the CHD phase. Although 50 C.F.R. 402.02 is not at issue here, the regulation's definition of the jeopardy standard as fully encompassing the adverse modification standard renders any purported economic analysis done utilizing the baseline approach virtually meaningless. We are compelled by the canons of statutory interpretation to give some effect to the congressional directive that economic impacts be considered at the time of critical habitat designation. Bridger Coal Co./Pac. Minerals, Inc. v. Dir., Office of Workers' Compensation Programs, 927 F.2d 1150, 1153 (10th Cir. 1991) ("We will not construe a statute in a way that renders words or phrases meaningless, redundant, or superfluous."). Because economic analysis done using the FWS's baseline model is rendered essentially without meaning by 50 C.F.R. § 402.02, we conclude Congress intended that the FWS conduct a full analysis of all of the

economic impacts of a critical habitat designation, regardless of whether those impacts are attributable co-extensively to other causes. Thus, we hold the baseline approach to economic analysis is not in accord with the language or intent of the ESA.

The FWS contends that should they be forced to abandon the baseline approach and consider all of the economic impact of a CHD, even if that impact is attributable co-extensively to another cause, they will be injecting economic analysis improperly into the listing process. The only two federal courts to consider this question come to essentially the same conclusion. N. M. Cattle Growers Ass'n, 81 F. Supp. 2d at 1158; Trinity County Concerned Citizens v. Babbitt, 1993 WL 650393 *4 (D.D.C. Sept. 20, 1993) (holding that absent the baseline approach, "the Secretary would be required to include . . . certain costs that might have already been incurred as a result of the listing of the species, for example, through the ESA's jeopardy and take provisions," even though "the Secretary is expressly forbidden from considering such economic costs in making the decision to list species"). We cannot agree.

Requiring that the FWS comply with the intent of the legislative body by considering economic impacts at a point subsequent to listing does not inject economic considerations into the listing process, but rather, situates those considerations in precisely the spot intended by Congress. Moreover, should this

ruling result in certain areas being excluded from future CHDs, it will not undermine congressional intent that economic factors be excluded from the listing decision. The listing of the species will remain in effect and the significant protections afforded a species by listing will not be undermined. Indeed, if the FWS's position that the protections afforded by a CHD are subsumed by the protections of listing is accepted, this ruling will result in no decreased protection for endangered species or their habitat.

IV.

As set forth above, the baseline approach to economic analysis pursuant the 16 U.S.C. § 1533(b)(2) is expressly rejected. The flycatcher CHD is thus set aside and the FWS is instructed to issue a new flycatcher CHD in compliance with this opinion as required by the ESA. Accordingly, the decision of the district court is REVERSED and the case is REMANDED to the district court for proceedings not inconsistent with this decision.