**CENTER FOR BIOLOGICAL DIVERSITY and California Native Plant Society, Plaintiffs,**

v.

**Gale NORTON, et al., Defendants.**

**Building Industry Legal Defense Foundation, a California nonprofit corporation, Plaintiffs,**

v.

**Gale Norton, et al., Defendants.**

**Nos. 01 CV 2101 IEG(LAB), 01–CV–2145 IEG(LAB).**

United States District Court, S.D. California.

July 1, 2002.

■■■■■■■■■■

Geoff Hickcox, Kenna and Hickcox, Durango, Co, Brendan R Cummings, Center for Biological Diversity, Idyllwild, CA, William E Halle, Hewitt and McGuire, Irvine, CA, for plaintiffs.

Mary Whittle, U.S. Department of Justice, Environment and Natural Resources Div, Washington, DC, U.S. Attorney CV, U.S. Attorneys Office Southern District of California, Civil Division, San Diego, CA, for defendants.

## ORDER SETTING TIMELINE ON REMAND

GONZALEZ, District Judge.

Pursuant to the May 9, 2002 joint stipulation for consolidation and remand, the parties to these consolidated cases briefed the Court on the appropriate timeline for new critical habitat determinations for the Peirson's milk-vetch, Lane Mountain milkvetch, Fish Slough milk-vetch, San Jacinto crownscale, Spreading Navarretia, Munz's Onion, Coachella Valley milk-vetch, and Thread-leaved brodiaea. Plaintiff Center

for Biological Diversity and California Native Plant Society's proposed timeline would provide the Service one to two years to complete new critical habitat determinations for all eight species. In contrast, defendants, as well as plaintiff Building Industry Defense Foundation and Intervenors, urge the Court to impose a deadline that would provide the Service three to four years to issue new and proposed rules on remand. For the reasons stated below, the Court rejects both proposed timelines as unreasonable and imposes its own.

## BACKGROUND

On November 15, 2001 Plaintiffs Center for Biological Diversity and California Native Plant Society (collectively, "CBD") filed suit against Gale Norton, Secretary of the Interior, and the United States Fish and Wildlife Service ("FWS" or the "Service") in this Court alleging that the defendants violated the Endangered Species Act ("EPA") and the Administrative Procedure Act ("APA") by determining that designating critical habitat for eight plant species listed as endangered or threatened is not prudent. Shortly thereafter, on November 21, 2001, plaintiff Building Industry Legal Defense Fund ("BILD") filed suit against the Secretary and the FWS alleging the same substantive claims. Both complaints seek a declaratory judgment that the Secretary failed to perform a mandatory, non-discretionary duty under the ESA and acted in a manner that was arbitary, capricious and otherwise not in accordance with law when she failed to designate critical habitat concurrent with the listing of the eight named species as either threatened or endangered. The complaints also seek an injunction ordering the Secretary to withdraw the not prudent determinations and issue new critical habitat designations for each of the eight plant species.

The Court convened an Early Neutral Evaluation Conference on March 19, 2002 before Magistrate Judge Larry Burns in which parties from both actions participated. At the conference, the parties agreed that (1) the critical habitat determinations for the eight plant species at issue in the cases would be remanded to the Service for reconsideration of its previous "not prudent" determinations; and (2) that the two cases should be consolidated into a single case. The only issue upon which the parties could not agree concerned the appropriate timeline for the issuance of new proposed and final critical habitat determinations on remand. However, the parties did agree to brief the Court regarding the appropriate schedule for reconsideration and to be bound by the Court's determination. Accordingly, Judge Burns ordered the parties to submit a joint stipulation for consolidation and remand, as well as briefs regarding the timeline.

Following the conference, on April 8, 2002, the Court granted a motion to intervene filed by the American Sand Association, California Off–Road Vehicle Association, American Motorcycle Association, Inc.—District 37, the San Diego Off–Road Coalition, and the Off–Road Business Association (collectively, "intervenors"). Intervenors, non-profit organizations that promote "multiple use" principles of public lands, contest CBD allegations with respect to one of the species at issue in this case, namely, the Peirson's milk-vetch (PMV), which is concentrated in the Imperial Sand Dunes of Imperial County, California. The Court accordingly limited intervenors' participation to the resolution of an appropriate timeline for reconsideration of the critical habitat determination for the PMV.

Pursuant to Judge Burns's order, defendants submitted a brief proposing a deadline for reconsideration of the critical habitat determinations on May 6, 2002. Plaintiffs CBD and BILD filed separate responses to defendants' brief on May 20, 2002. In its response brief, CBD con-

tends that defendants' proposed timeline is unreasonably long and proposes an alternative timeline for the Court's consideration. By contrast, in its response BILD urges the Court to adopt defendants' proposed timeline. On June 3, 2002, CBD and BILD filed reply briefs, which addresses many of the arguments raised by each plaintiff in their respective May 20, 2002 response briefs. Defendants filed a reply brief on June 2, 2002. Finally, on June, 6, 2002, intervenors submitted a response brief, arguing in support of defendants' proposed timeline.

## DISCUSSION

### A. Legal Standard

As an initial matter, this Court must determine the degree of discretion it possesses in setting a deadline for the defendants. CBD argues that the Court's discretion to set a deadline is quite limited. In support of this argument, CBD cites a number of cases in which the court, after finding a violation of the ESA, concluded that its traditional discretion in deciding whether or not to issue an injunction is circumscribed by Congress. *See Biodiversity Legal Foundation et al. v. Badgley et. al.*, 284 F.3d 1046, 1047 (9th Cir.2002) ("The exercise of discretion is foreclosed when statutorily imposed deadlines are not met."); *Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir.1999) (holding that in the context of the ESA, "Congress, through 5 U.S.C. § 706, has explicitly removed from courts the traditional equity balancing that ordinarily attends decisions whether to issue injunctions"); *National Wildlife Fed. v. Burlington R.R. Inc.*, 23 F.3d 1508 (9th Cir.1994) ("In cases involving the ESA, Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests."). However, all of the cases cited by CBD are distinguishable in that they involved violations of the ESA's mandatory, non-discretionary deadlines. By contrast, in this case, the parties stipulated to a voluntary remand of the FWS's "not prudent" determinations without reaching the merits of the plaintiffs' complaints. FWS entered the stipulation, as did all the parties to this action, without making any admissions of fact or law.

Nevertheless, CBD maintains that the FWS's acceptance of a remand does not restore this Court's equitable discretion in setting a timeline for reconsideration. In particular, CBD contends that this Court lacks the discretion to set a timeline for reconsideration that exceeds two years. CBD derives the two-year term from the mandatory timeline provisions of the ESA governing the promulgation of critical habitat designations following receipt of a petition for listing a species as endangered or threatened. (CBD reply brf. at 3). The Court finds this argument unpersuasive. Title 16 U.S.C. § 1533(b)(6)(C) provides that a "final regulation designating critical habitat of an endangered species or a threatened species shall be published concurrently with the final regulation implementing the determination that such species is endangered or threatened," unless such a designation is not determinable or would not be prudent. CBD correctly notes that, given this deadline, the FWS will have at most two years from receipt of a petition to list a species as endangered or threatened to designate critical habitat, absent a "not prudent" or "not determinable" exception. However, in this case, the FWS already met its statutory deadline by making its "not prudent" determinations for all eight species at issue concurrent with listing them as either endangered or threatened. *See* 63 Fed.Reg. 53596 (Oct. 6, 1998); 63 Red.Reg. 54975 (Oct. 13, 1998).

While CBD disputes legality of those "not prudent" determinations, given the

joint stipulation, the Court is not in a position to review the validity of the original determinations. CBD asserts that such a conclusion creates "an overly permissive standard," allowing the Service to circumvent ESA's mandatory deadlines by issuing unfounded "not prudent" determinations concurrent with listing a species and then arguing for a lengthy timeline on remand when challenged in court. (CBD reply at 4). According to CBD, given the Service's history of routinely making "not prudent" determinations, "in the absence of litigation the illegal findings would likely never be corrected and the species in need of habitat protection would never receive it." *Id.* This argument may provide a practical reason for not granting the Service a generous timeline on remand, but it does not support CBD's legal contention, namely, that the Court lacks any discretion to give defendants more than two years on remand.

■ Defendants, relying on *Environmental Defense Center v. Babbitt*[1], contend that in setting a timeline for reconsideration, the Court should follow a standard of reasonableness. (Df. brf at 10). In *Environmental Defense Center*, the Ninth Circuit vacated a district court order compelling the FWS to take final action on the California red-legged frog because compliance with the order would conflict with a Congressional spending moratorium on all listing activities. The Ninth Circuit remanded the case to the district court with instructions to "modify its order and judgment to provide that compliance with the requirement that the Secretary make a final determination as to the endangered status of the California red-legged frog is delayed until a reasonable time after appropriate funds are made available, the time to be specified by the district court." *Id.* at 872. Defendants' reading of *Environmental Defense Center* is in accord with that of other district courts in the this Circuit. *See. e.g., Conservation Council for Hawai'i v. Babbitt*, 24 F.Supp.2d 1074, 1076 (D.Haw.1998) ("In setting a timeline for agency action, the Ninth Circuit has instructed courts to follow a standard of reasonableness.").[2] The Court will therefore set a reasonable timeline for defendants to complete the critical habitat determinations. In setting this timeline, the Court will exercise its discretion to consider the Service's budgetary shortfalls, workload constraints and other relevant factors when setting the timeline. *See Center for Biological Diversity v. Norton*, 2001 WL 1602696 (N.D.Cal.2001) (holding that a court, in issuing an injunction pursuant to 16 U.S.C. § 1540(g)(1)(C) may "use its equitable discretion to account for certain practical realities such as existing court-ordered obligations and budgetary shortfalls").[3]

1. 73 F.3d 867 (9th Cir.1995).

2. In *Conservation Council for Hawai'i*, the court held that the Service had acted arbitrarily, capriciously, and contrary to law then it made "not prudent" determinations for 245 endangered of threatened plant species. The court set a timeline for reconsideration of the determinations on remand that gave the Service more than three years to issue new proposed rules for 145 of the species at issue in the case. *Id.* at 1079. CBD discusses the facts of this case in its opening brief, but it never reconciles the holding of the case with its later assertion that "the law is clear that

FWS should have no more than two years to propose and finalize critical habitat. . . ." (CBD reply brf. at 3).

3. The Court rejects CBD's contention that *Center for Biological Diversity v. Norton*, 2001 WL 1602696 was "implicity" overruled by the Ninth Circuit's recent opinion in *Biodiversity Legal Foundation v. Badgley*, 284 F.3d 1046 (9th Cir.2002). In *Badgley*, the Ninth Circuit held that an injunction must issue where the Service fails to comply with a mandatory deadline contained in Section 4 of the ESA. *Id.* at 1057 ("The Service's failure to complete the listing determinations within the mandat-

## B. The Parties' Proposals

Under defendants' proposed timeline, the Service would not begin its reconsideration of critical habitat for any of the eight species until FY 2004. Defendants' proposed timeline is as follows:

| | Proposed Rule | Final Rule |
|---|---|---|
| Person's milk-vetch | 7/28/04 | 7/28/05 |
| Lane Mountain milk-vetch | 9/15/04 | 9/15/05 |
| Fish Slough milk-vetch | 11/15/04 | 11/15/05 |
| San Jacinto Valley crownscale | 1/30/05 | 1/30/06 |
| Spreading Navarretia | 1/30/05 | 1/30/06 |
| Munz's Onion | 5/30/05 | 5/30/06 |
| Coachella Valley milk-vetch | 11/30/05 | 11/30/06 |
| Thread–leaved Brodiaea | 11/30/05 | 11/30/06 |

CBD offers as an alternative the following schedule:

| | Proposed Rule | Final Rule |
|---|---|---|
| Peirson's milk-vetch | 10/02/02 | 7/02/03 |
| Lane Mountain milk-vetch | 10/02/02 | 7/02/03 |
| Spreading navarretia | 01/15/03 | 10/15/03 |
| San Jacinto crownscale | 01/15/03 | 10/15/03 |
| Munz's onion | 03/17/03 | 12/15/03 |
| Thread–leaved brodiaea | 03/17/03 | 12/15/03 |
| Fish Slough milk-vetch | 5/15/03 | 2/16/04 |
| Coachella Valley milk-vetch | 5/15/03 | 2/16/04 |

## C. The Parties' Arguments

Defendants contend that FWS lacks the resources to begin reconsidering its "not prudent" determinations before FY 2004. (Df. brf. at 9). Congress placed a $9 million cap on FWS listing activities for FY 2002, along with a sub-cap of $6 million for critical habitat determinations for already-listed species. FWS anticipates that it will spend the entire $6 million critical habitat sub-cap to comply with pending court orders and settlement agreements. (Frazer dec. ¶¶ 8–9). During FY 2003 FWS estimates that it will need at least $4.69 million of the President's requested $5 million cap for critical habitat activities for FY 2003 in order to comply with pending court orders and settlement agreements [4]. (Frazer dec. ¶ 17). While FWS concedes that under its estimates about 10 percent of the FY 2003 budget remains available for critical habitat actions, it notes that its current estimates are only preliminary and likely contain some underestimates. FWS prefers to keep these remaining funds on reserve to ensure compliance with its existing obligations. Therefore, FWS maintains that, similar to FY 2002, it does not have the resources to begin reconsidering its "not prudent" determinations in FY 2003. According to FWS, were this Court to order it to begin reconsidering its "not prudent" determinations before FY 2004, FWS would be forced either to violate preexisting court orders or the Anti–Deficiency Act.[5]

In response, CBD argues that the Service has consistently failed to request adequate funding from Congress. CBD notes that every year following the FY 1995–96 funding moratorium, with the exception of FY 2002, the Service requested less for the listing program than Congress had approved in the year preceding the moratori-

---

ed time frame compelled the court to grant injunctive relief."). That is, the issue in *Badgley* was whether a court has discretion to decide whether or not to issue an injunction in the face of a violation of a Section 4 deadline. This is distinct from the question of a court's discretion in setting a timeline for agency reconsideration on remand of a "not prudent" determination, particularly where there has been no finding of a statutory violation.

4. The $5 million requested for FY 2003 represents a $1 million reduction in funding for critical habitat actions, reflecting the FWS view that listing activities should be given a higher priority than critical habitat actions. (Frazer dec. ¶ 15).

5. 31 U.S.C. 1341 (1994).

um. (CBD resp., p. 6 n. 3). The Court notes, however, that over this period Congress generally provided the Service with less funding than it requested, so it isn't clear what FWS could have accomplished by requesting more funding during this period (*See* Trezise decl. ¶ 3). Further, CBD asserts that the Service requested the very spending caps on critical habitat actions which it now claims restrict its ability to begin new determinations until FY 2004. CBD also cites to several cases in which the court discounted the Service's purported budgetary difficulties when setting a timeline for critical habitat determinations. *See, e.g., Conservation Council for Hawai'i,* 24 F.Supp.2d at 1078 (" 'To the extent the [agency] feels aggrieved by Congress' failure to allocate proper resources in which to comply with [its] statutory duty, Congress, not the courts, is the proper governmental body to provide ... relief.") (quoting *Southwest Ctr. for Biological Diversity v. Babbitt,* No. 96–1874, slip. op. at 7 (D.Ariz.1997)). Finally, CBD argues that because Congress has not yet enacted the FY 2003 budget, the Court should not accept FWS's contention that FY 2003 funds are unavailable.

The FWS also maintains that, even absent the limitations on its budget, the staff at the offices responsible for conducting critical habit determinations are already under such a heavy burden dealing with existing court orders and court approved settlement agreements that initiating reconsideration of the "not prudent" findings before FY 2004 would be infeasible. (Frazer decl. ¶ 4). For example, the Carlsbad Fish and Wildlife Office (CFWO) is the lead field office for six of the species at issue in this case. Currently this office employs one biologist working full time on listing activities, though it plans to hire and train additional biologists at the beginning of FY 2003. Defendants anticipate that during FY 2003 CFWO will be required to work on as many as ten listing or

critical habitat actions stemming from litigation. The Ventura Field Fish and Wildlife Office (VFWO), which has primary responsibility for the other two species, must conduct several litigation driven listing and critical habitat actions as well during FY 2002 and FY 2003. Defendants also outline the considerable listing and critical habitat responsibilities facing the Region 1 Office and the Service's Washington Office. For example, in FY 2002, the Region 1 Office must work on critical habitat determinations for approximately 290 species to comply with court orders and court approved settlements.

Apart from the workload associated with listing and critical habitat actions, defendants contend that staff at all the relevant offices in this case will be required to devote substantial time to litigation support. (Frazer decl. ¶¶ 37–9). Defendants note that as of April 29, 2002, the Service is involved in 46 active lawsuits concerning 57 species and is complying with 24 court orders stemming from lawsuits involving 330 species. Moreover, within the last year the Service has received 18 Notices of Intent to Sue (NOIs). (Frazer decl. ¶ 38).

In its response, CBD disputes defendants' assertions regarding the workload burden imposed on the Service's Washington, Regional, and field offices in the form of litigation support. Specifically, CBD asserts that much of the litigation support activity cited by defendants consist of preexisting obligations, "boilerplate" declarations, and other minor administrative tasks. Consequently, CBD argues that defendants' purported litigation support workload do not justify its proposed timeline. (CBD resp. p. 9–10). Apart from litigation support, CBD does not address defendants' assertions concerning CFWO's and VFWO's heavy workload burdens.

In addition to contesting defendants' assertion that they cannot begin new critical

habitat determinations until FY 2004, CBD argues that the length of time requested by FWS to conduct such determinations, once it begins the process, is unreasonably long. Specifically, CBD asserts that the multiple layers of internal review described by defendants in their brief are not mandated by statute and simply result in months of unnecessary delay. (CBD brf. p. 6). ·Under the CBD's proposed timeline, FWS would have less than eleven months to issue proposed critical habitat designations for all but two of the species. Defendants, in response, maintain that these multiple layers of internal review are necessary given the complexity of drafting proposed and final critical habitat designations. (Def. reply p. 8 ("Designating critical habitat requires substantial internal agency review and approval because no one individual has the expertise to draft a document as complicated as a rule designating critical habitat without assistance.")).

Apart from these allegedly unnecessary layers of internal review, CBD argues FWS unreasonably delays the critical habitat designation process by preparing a draft economic analysis concurrent with preparing the proposed rule. CBD notes that nothing in either the ESA or its implementing regulations requires the Service to formulate a draft economic analysis or to have such an analysis available for public comment. (CBD resp. p. 7). Rather, the ESA only requires that FWS conduct an economic analysis following the issuance of a proposed rule, and there is no requirement for public comment. *See* 50 C.F.R. § 424.19. CBD also cites *Conservation Council of Hawai'i* in which the court concluded that a non-statutorily mandated economic analysis "should not be used as a justification for contravening the deadlines specified by the statute." 24 F.Supp.2d at 1078. Defendants, though conceding that a draft economic analysis is not statutorily mandated, argue that FWS would be subjected to "even more litigation if this process were dispensed with." (Df. reply p. 8).

On a related point, CBD asserts that FWS introduces unnecessary delay by contracting all of its economic analyses with a single third party economist who then subcontracts the work. According to FWS, it contracts all of its economic analysis with one third party economist in order to promote consistency. Moreover, the FWS contends that any delay in this process is a product of limitations on the FWS's ability to supervise the economic analyses produced, rather than the ability of the third party economist to handle multiple assignments at one time. (Df. reply p. 8 ("noting that 46 economic analyses for critical habitat designations are [currently] underway")).

CBD also argues that FWS unreasonably delays the critical habitat designation process by providing more time for public comment on the proposed rule than is statutorily required. (CBD brf. p. 7). Under the ESA's implementing regulations, following publication of a proposed critical habitat designation, the Service must provide at least 60 days for public comment. *See* 50 C.F.R. 424.16(c)(2). FWS anticipates that it will provide four months of public comment following publication of proposed rules for each species, approximately twice the minimum required by the regulations. (Frazer decl. ¶ 27). According to FWS, critical habitat designations generally elicit considerable public comment, including requests for extension by either commentors or members of Congress. Given the importance of public participation in the conservation process, FWS argues that its anticipated public comment period, though approximately twice the statutory minimum, is reasonable. (Df. reply p. 8; Frazer decl. ¶ 26).

Following publication of a proposed rule designating critical habitat, ESA provides that a final rule must be published within one year. *See* 16 U.S.C. § 1533(b)(6)(A)(ii)(I). Under defendants' timeline, FWS would have the maximum one year period between issuance of the proposed rule and the issuance of the final rule for each of the species, assuming it finds a designation prudent. In contrast, CBD argues FWS should have no more than nine months, noting that the ESA contemplates that a final rule could be issued as early as 90 days after the promulgation of the proposed rule. *See* 16 U.S.C. § 1533(b)(5)(A).

Finally, CBD notes that its proposed timeline is relatively generous when compared with the deadlines imposed by other courts on the Service for completing new critical habitat determinations. CBD cites several cases in which courts imposed shorter timelines on FWS to issue critical habitat rules than those proposed by CBD in this case. *See, e.g., Forest Guardians v. Babbitt,* 174 F.3d 1178, 1193 (10th Cir. 1999) (discussing cases); *Center for Biological Diversity v. Babbitt,* No. C–99–

3202 SC (N.D.Cal. Aug. 30, 2000) (CBD Ex. G) (ordering Service to publish proposed critical habitat rules for four listed species within 60 days and final rules within 120 days); *National Resources Defense Council v. Department of Interior,* No. 99–CV 5246 SVW (Ctx) (C.D.Cal. Aug. 4, 1999) (CBD Ex. E) (noting that district courts often allow between 5 and 120 days to publish proposed rules). Defendants respond by asserting that they have been forced to request extensions to comply with many of these court imposed deadlines.[6] Moreover, both defendants and BILD argue that critical ·habitat designations prepared in accordance with unreasonably short court-imposed timelines are vulnerable to legal challenge. (Df. reply p. 10 ("FWS's new critical habitat determinations on remand must be accomplished in a manner that will ultimately withstand judicial scrutiny."); BILD brf. p. 13 (citing cases)). By contrast, CBD contends that the Service's critical habitat designations have been overturned only because of its use of an invalid "baseline approach" to economic analysis,[7] not because of compressed court ordered deadlines.[8] (CBD reply p. 7).

---

6. In support of this assertion, defendants reference a chart listing its requests for extensions to complete critical habitat designations and listing rules. *See* Df. reply (Ex. A).

7. In *New Mexico Cattle Growers Association v. United States Fish and Wildlife Service,* 248 F.3d 1277, the 10th Circuit held that the Service's incremental baseline approach to economic analysis "is not in accord with the language or intent of the ESA." *Id.* at 1285. Under the baseline approach, "unless an economic impact would not result but for the CHD, that impact is attributable to different cause (typically listing) and is not an 'economic impact . . . of specifying any particular area as critical habitat' " *Id.* at 1283 (quoting 16 U.S.C. § 1533(b)(2)).

8. BILD, in its opening brief, cites several court opinions which it claims "demonstrate the Service is not properly designating critical habitat under the pressure it faces" (BILD

brf. p. 13). These cases, along with other documents, are attached as exhibits to BILD's request for judicial notice, pursuant to Rule 201(b)(2) of the Federal Rules of Evidence on June 3, 2002. The Court grants this motion. In one of the attached cases, *National Association of Home Builders v. Norton,* No. CIV–00–903–PHX–SRB, 2001 WL 1876349 (D.Ariz. Sept. 21, 2001), the court invalidated the Service's CH designation for the cactus ferruginous pygmy-owl after the Service conceded that its economic analysis was flawed. While the Service agreed to a limited remand to reconsider the economic analysis used in the first designation, the court concluded that a "broader reconsideration of the critical habitat designation is necessary." *Id.* at *4. In particular, the court cited the Service's failure to conduct systematic pygmy owl surveys over all the species's habitat in Arizona. *Id.*

## D. TIMELINE FOR RECONSIDERATION ON REMAND

 After carefully considering the arguments outlined above, the Court concludes that CBD's proposed timeline is unreasonable. CBD's timeline would require the Service to begin working on the reconsideration in FY 2002, although the Service has already allocated all of the $6 million in funding for critical habitat designations for already-listed species to comply with existing court orders and settlement agreements. Rather than explain how the Service can fund new critical habitat determinations in FY 2002, CBD blames the Service for its current budgetary problems and argues that insufficient appropriations are properly a matter for Congress, not the courts. CBD also contends that the Court should adopt its proposed timeline, in part, because the Service failed to "carry its burden" of showing that such compliance would be impossible. (CBD brf. at 21). Defendants, however, do not have the burden to prove that compliance with CBD's timeline would be impossible. Defendants have demonstrated to the Court's satisfaction that compliance with CBD's proposed timeline would force the Service to either violate existing court orders and settlement agreements or the Anti–Deficiency Act. This, the Court concludes, would be unreasonable.

 The Court also concludes that defendants' proposed timeline is unreasonable. In particular, the Court is not persuaded that the Service cannot begin reconsidering any of its "not prudent" determinations until FY 2004. While defendants claim that all critical habitat funds for FY 2003 are already committed to existing court orders and settlement agreements, Congress has yet to pass the FY 2003 budget. Defendants' argument that the entire FY 2003 budget for critical habitat actions is already committed is therefore premature, particularly given the fact that Congress appropriated considerably more funding for listing actions in FY 2002 than the Service requested. While the Court also sympathizes with the workload facing the Service's field offices, the Court notes that CFWO, the field office with lead responsibility for most of the species, plans to hire additional biologists at the beginning of FY 2003. VFWO, the field office with lead responsibility for the other species, has two biologists working full time on the listing program and, in FY 2003, must work on only one critical habitat rule and assist another field office with designating critical habitat for the Vernal pool complex. (Frazer decl. ¶ 34). In addition, the Court notes that for some, if not all, of the species, the Service may once again determine that designating critical habitat is "not prudent" pursuant to 50 C.F.R. § 424.12, thereby avoiding much of the work associated with designating critical habitat. The Court is not convinced that the workload facing these offices, though substantial, precludes any work on new critical habitat determinations until FY 2004. Finally, while some of the procedures described by defendants may not be statutorily mandated, the Court concludes that the timeline proposed by defendants, once the Service begins its reconsiderations, is reasonable. Accordingly, the Court finds the following to be a reasonable timeline:

| | Proposed Rule | Final Rule |
| --- | --- | --- |
| Person's milk-vetch | 7/28/03 | 7/28/04 |
| Lane Mountain milk-vetch | 9/15/03 | 9/15/04 |
| Fish Slough milk-vetch | 11/15/03 | 11/15/04 |

| | | |
|---|---|---|
| San Jacinto Valley crownscale | 1/30/04 | 1/30/05 |
| Spreading Navarretia | 1/30/04 | 1/30/05 |
| Munz's Onion | 5/30/04 | 5/30/05 |
| Coachella Valley milk-vetch | 11/30/04 | 11/30/05 |
| Thread–leaved Brodiaea | 11/30/04 | 11/30/05 |

## CONCLUSION

For the reasons stated above, the Court **ORDERS** the FWS to publish a proposed critical habitat designation or non-designation for the Peirson's milk-vetch by July 28, 2003; for the Lane Mountain milk-vetch by September 15, 2003; for the Fish Slough milk-vetch by November 15, 2003; for the San Jacinto crownscale by January 30, 2004; for the Spreading navarretia by January 30, 2004; for the Munz's onion by May 30, 2004; for the Coachella Valley milk-vetch by November 30, 2004; and for the Thread-leaved brodiaea by November 30, 2004. The Court further **ORDERS** that within one year of the publication of each proposed designation or nondesignation, the FWS publish a final rule in the Federal Register regarding critical habitat designation or nondesignation for that species.