BUILDING INDUSTRY LEGAL
DEFENSE FOUNDATION,
et al., Plaintiffs,

v.

Gale NORTON, Secretary of the
Interior, et al., Defendants,

and

Center For Biological Diversity, Inc.
and Defenders Of Wildlife, Inc.
Intervenors/Defendants

No. CIV.A. 01–2311(JDB).

United States District Court,
District of Columbia.

Oct. 30, 2002.

Robert D. Thornton, Nossaman, Gunther, Knox & Elliot, L.L.P., Irvine, CA.

Matt Kenna, Kenna & Hickcox, P.C., Durango, CO.

Michael P. Senatore, Defenders of Wildlife, Washington.

Kristen Gustafson, United States Department of Justice, Environment and Natural Resources Division, Washington.

### *MEMORANDUM OPINION*

BATES, District Judge.

Plaintiffs bring this case under the Endangered Species Act of 1973 ("ESA"), 16 U.S.C. § 1531, *et seq.*, the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.*, the Regulatory Flexibility Act, 5 U.S.C. § 601, *et seq.*, the Small Business Regulatory Enforcement Act, 5 U.S.C. § 801, *et seq.*, and the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.* They challenge the adoption by the United States Fish and Wildlife Service ("FWS") of final rules designating critical habitats for two species. FWS now moves to vacate the final rules and remand the designations for reconsideration in light of a recent decision by the United States Court of Appeals for the Tenth Circuit. For the reasons stated below, the Court will vacate the existing rules and order a remand to FWS. However, the Court will order a shorter time frame for the promulgation of new rules than FWS has requested.

### FACTUAL AND PROCEDURAL BACKGROUND

The ESA requires FWS to determine whether a given species should be listed as endangered or threatened based upon the "best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A). Concurrent with the listing of the species, FWS may designate a "critical habitat," *id.* § 1533(a)(3)(A), defined as:

> (i) the specific areas within the geographical area occupied by the species ... on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and (ii) specific areas outside the geographical area occupied by the species ... upon a determination by the Secretary that such areas are essential for the conservation of the species.

*Id.* § 1532(5)(A). A critical habitat designation should be made based upon the "best scientific data available and after taking into consideration the economic impact, and any other relevant impact, of specifying any particular area as critical habitat." *Id.* § 1533(b)(2).

In the early 1990s, FWS listed the Riverside fairy shrimp and the arroyo southwestern toad as endangered species under the ESA. *See* Determination of Endangered Status for Three Vernal Pool Plants

and the Riverside Fairy Shrimp, 58 Fed. Reg. 41,384 (Aug. 3, 1993); Determination of Endangered Status for the Arroyo Southwestern Toad, 59 Fed.Reg. 64,589 (December 16, 1994). On February 7, 2001, FWS issued a final rule designating critical habitat for the arroyo southwestern toad. *See* Final Designation of Critical Habitat for the Arroyo Toad, 66 Fed.Reg. 9414. On May 30, 2001, FWS did the same with respect to the Riverside fairy shrimp. *See* Final Designation of Critical Habitat for the Riverside Fairy Shrimp, 66 Fed.Reg. 29,384.

On November 6, 2001, plaintiffs Building Industry Legal Defense Foundation, Foothill/Eastern Transportation Corridor Agency, National Association of Home Builders, California Building Industry Association, and Building Industry Association of San Diego County (collectively, "plaintiffs") brought this action against FWS, the United States Department of the Interior, and the respective heads of those agencies (collectively "defendants") to challenge the critical habitat designations. Plaintiffs allege several errors by FWS in promulgating the final rules, including that FWS used the wrong legal standard in making the designations, that FWS's economic analyses were erroneous and inadequate, and that FWS did not properly balance the benefits and impacts of the designations. On March 13, 2002, this Court granted the motion of Center for Biological Diversity, Inc. and Defenders of Wildlife, Inc. ("intervenors"), two environmental groups, to intervene as defendants.

On April 2, 2002, defendants moved to vacate and remand the critical habitat designations, and, accordingly, dismiss plaintiffs' complaint as moot, in light of the Tenth Circuit's decision in *New Mexico Cattle Growers Ass'n v. United States Fish & Wildlife Svc.*, 248 F.3d 1277 (10th Cir.2001). In that case, the Tenth Circuit reviewed the "baseline" approach used by FWS to analyze the economic impact of critical habitat designation for the southwestern willow flycatcher. Consistent with the baseline approach, FWS had examined only those economic impacts that were solely attributable to the critical habit designation for the species; any economic impacts that were attributable to different causes, such as listing of the species, were not considered. *Id.* at 1283. Because FWS had determined that the impacts of flycatcher listing were co-extensive with the impacts of designating critical habitat, the agency concluded that no real impact resulted from the critical habitat designation. *Id.* at 1283–84.

The Tenth Circuit rejected the baseline approach, noting that it rendered FWS's economic analysis "essentially without meaning." *Id.* at 1285. The proper way to give effect to the congressional intent that economic impacts be considered at the time of critical habitat designation, the court concluded, was for FWS to "conduct a full analysis of all of the economic impacts of a critical habitat designation, regardless of whether those impacts are attributable co-extensively to other causes." *Id.*

FWS has concluded that the Tenth Circuit's decision in *New Mexico Cattle Growers* is correct, and thus asks this Court to vacate the critical habitat designations for the arroyo southwestern toad and the Riverside fairy shrimp and remand the matters back to the agency, because the designations, like that in *New Mexico Cattle Growers*, were based upon a baseline approach. FWS argues, moreover, that it should be given until the spring of 2005 to designate new critical habitats. Plaintiffs, for their part, agree that vacatur and remand are appropriate.

Intervenors, on the other hand, contend that the Tenth Circuit's analysis in *New Mexico Cattle Growers* was wrong and should not be endorsed by the Court. Although they agree that the economic impact analyses done by FWS are flawed, and that a remand for further consideration of those analyses may be in order, *see* Intervenors' Response to Mot. to Vacate at 2, they argue that the Court should direct FWS to follow a different methodology for designating critical habitat that would "measure[ ] the true economic impact (both negative and positive) of the critical habitat designation above and beyond listing," *id.* at 19 (emphasis added). Citing *Sierra Club v. United States Fish & Wildlife Svc.*, 245 F.3d 434 (5th Cir.2001), intervenors contend that the baseline approach yields a meaningless economic impact analysis only because, employing misguided FWS regulatory standards at 50 C.F.R. § 402.02, the protections arising out of critical habitat designation are not significantly greater than the protections afforded by listing a species.[1] If FWS had a proper understanding of the import of critical habitat designation, intervenors contend, the economic impacts of designation would be more significant and would not overlap with those of listing, and thus the congressional directive to conduct an economic impact analysis could be given effect even excluding impacts attributable to listing. Intervenors also argue that vacatur during remand is improper, and that, in the event the rules are vacated, FWS should be allowed only 100 days to review the matters on remand.

## ANALYSIS

### I. Remand

■ As the foregoing discussion indicates, the Court is presented with a somewhat unusual set of circumstances. All parties, including the responsible agency, agree that the economic analyses used in designating the critical habitats are substantively defective. However, the parties fundamentally disagree on what methodology FWS should use. Plaintiffs and defendants urge the Court to adopt the Tenth Circuit's approach, and thus to require an assessment that includes all impacts of critical habitat designation—even impacts that are attributable co-extensively to listing and other causes. Intervenors ask the Court instead to conclude that FWS must assess the "true" consequences of critical habitat designation and exclude consideration of impacts attributable to listing. In making this request, intervenors in effect ask the Court to reject an

1. Intervenors' argument turns upon Section 7(a)(2) of the ESA, which requires each federal agency to ensure that any action "authorized, funded, or carried out by such agency" is "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of critical habitat." 16 U.S.C. § 1536(a)(2). Under the FWS regulation at 50 C.F.R. § 402.02, the term "destruction or adverse modification" in Section 7(a)(2) is defined to mean "a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species," and the term "jeopardize the continued existence of" is defined to mean "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." (emphasis added). Thus, under 50 C.F.R. § 402.02, FWS construes the standards for determining "jeopardy" (in the context of listing) and "adverse modification" (in the context of designated critical habitat) to be largely overlapping. Intervenors contend that the term "destruction or adverse modification" should instead be defined in terms of "recovery" alone—an interpretation that would arguably give broader significance to the designation of critical habitat.

FWS regulation that they contend strips critical habitat designation of its intended significance.

The Court declines to accept either invitation in full. In the limited context of this motion to remand and vacate, the Court's primary task is to determine whether the existing rules require further consideration by the agency. There is no dispute that they do. As all parties recognize, FWS, by declining to consider impacts of critical habitat designation that were co-extensively attributable to other causes and by concluding that the economic impacts of critical habitat designation above and beyond listing were not significant, see 66 Fed. Reg. at 9446–47, 66 Fed.Reg. at 29,400–01, rendered meaningless the congressional charge in 16 U.S.C. § 1533(b)(2) to assess the economic impact of critical habitat designation.

Whether the flaw in FWS's analyses relates to the exclusion of impacts attributable to other causes, as *New Mexico Cattle Growers* would suggest, or instead to some failure by FWS to appreciate the import of critical habitat designation, as intervenors urge, is a question that is better left for another day. Given the absence of any pending motion for summary judgment or any administrative record, the fact that the agency has not yet had the opportunity to reassess these particular critical habitat designations on the merits in the wake of *New Mexico Cattle Growers*, and the potentially serious implications for environmental policy of a judicial decision endorsing the arguments of one side or the other, it would be imprudent and premature for the Court to opine abstractly on what regulatory significance critical habitat designation should have and what steps the agency must take in preparing an economic analysis and designating critical habitat.[2] The answers to those questions are best addressed in the first instance by the agency itself as it considers the designations on remand and further hones its policy in light of the decisions in *New Mexico Cattle Growers* and *Sierra Club*. For now, it is sufficient for the Court to conclude that the economic analyses used in promulgating the existing rules were arbitrary, capricious, or otherwise not in accordance with law. Accordingly, the critical habitat designations for both species, including the attendant economic analyses, shall be remanded to FWS.[3]

## II. Vacatur

■ The Court's conclusion that the economic analyses were conducted erroneously does not necessarily mean that the final rules must be vacated. "The decision whether to vacate depends upon the 'seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'" *Allied–Signal, Inc. v. United States Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C.Cir. 1993) (quoting *Int'l Union, UMW v. FMSHA*, 920 F.2d 960, 966–67 (D.C.Cir. 1990)). Applying this test to the instant case, the Court concludes that vacatur is appropriate.

---

**2.** The Court is also somewhat hamstrung in assessing the merits of intervenors' argument under *Sierra Club*, as both plaintiffs and defendants seem to regard this argument as only tangential to the motion at hand and thus have given it minimal attention in their briefs.

**3.** FWS couches its motion as one for a "voluntary remand." Because the Court has ruled at least partially on the merits in concluding that the economic analyses were faulty, the remand ordered by the Court is not to be construed entirely as "voluntary"; the remand is compelled by FWS's errors in promulgating the final rules.

■ Regardless of whether the Tenth Circuit's approach or intervenors' proposed approach is the right one, there is no doubt that the agency was wrong in electing to use the baseline approach. Consideration of economic impacts is mandatory, not discretionary. *See* 16 U.S.C. § 1533(b)(2) (FWS "**shall designate critical habitat** ... on the basis of the best scientific data available and **after taking into consideration the economic impact,** and any other relevant impact, of specifying any particular area as critical habitat" (emphasis added)). Moreover, the statutory language indicates that an economic impact analysis is required so that it may inform the critical habitat designation. *See id.* Accordingly, the erroneous impact analyses in this case may have contributed to incorrect critical habitat designations. FWS's uses of the baseline approach thus constitute serious substantive errors, not mere procedural flaws, and hence warrant vacatur. *See Nat'l Ass'n of Home Builders v. Norton,* 2001 WL 1876349, at \*3 (D.Ariz. Sept.21, 2001) ("failure to comply with the statutory requirements [for critical habitat designation] is more than a minor procedural error"; vacating final rules designating critical habitat); *Idaho Farm Bureau Fed'n v. Babbitt,* 58 F.3d 1392, 1405–06 (9th Cir.1995) (no vacatur where errors were procedural); *Endangered Species Comm. v. Babbitt,* 852 F.Supp. 32, 41–43 (D.D.C.1994) (no vacatur where error was procedural).

On the other side of the balance, there is no evidence that vacating the critical habitat designations will lead to significant disruptive consequences. All parties agree that the primary protection for species

arising from critical habitat designation is found in Section 7(a)(2) of the ESA, which requires each federal agency to ensure that any action "authorized, funded, or carried out by such agency" is "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of critical habitat." 16 U.S.C. § 1536(a)(2). Federal agencies must consult with FWS under Section 7 whenever federal action "may affect" a listed species or its critical habitat. *See* 50 C.F.R. § 402.14(a).

Defendants have submitted evidence that four of the five vernal pools designated as critical habitat units for the fairy shrimp and all of the twenty-two riparian areas designated as critical habitat units for the arroyo toad are currently occupied by the respective species. Declaration of Gary Frazer ¶¶ 8, 16–17. Moreover, defendants have submitted evidence that all of the Section 7 consultations performed in critical habitat areas since critical habitats were designated would have been completed even in the absence of designation because the presence of the species would have triggered concern over "jeopard[y][to] the continued existence" of the species. 16 U.S.C. § 1536(a)(2); *see* Frazer Dec. ¶¶ 8, 19, 21. Based on the presence of the species in almost all designated areas and the consultation histories for the species, defendants have concluded that vacating the existing critical habitat designations is unlikely to impact the number of Section 7 consultations conducted during the remand period or the outcomes of those consultations. *See* Frazer Dec. ¶¶ 8, 21–22.[4]

---

**4.** With respect to the single critical habitat unit currently not occupied by the fairy shrimp, FWS notes that the site is adjacent to, and partially within, the El Segundo Blue Butterfly Preserve, and thus may receive protections under Section 7 of the ESA by virtue of the butterfly's presence. Frazer Dec. ¶ 10. In addition, the site is under the flight path of one of the main runways at Los Angeles International Airport and therefore could only be

Defendants have also identified a host of regulatory protections beyond those found in Section 7 that may function to protect the fairy shrimp and the arroyo toad even absent critical habitat designation. They note that Sections 9 and 10 of the ESA generally prohibit non-federal actors from "taking" a species unless they submit a habitat conservation plan and follow other steps to obtain a permit. 16 U.S.C. §§ 1538, 1539; 50 C.F.R. § 17.22(b)(1). Defendants and plaintiffs also assert that the California Environmental Quality Act, the California Porter–Cologne Water Quality Control Act, various provisions of the California Fish and Game Code, and other state and local protections will assist in ensuring that the species and their vernal pool and riparian habitats will be protected. *See* Frazer Dec. ¶¶ 7, 18; Defs.' Mem. at 27; Pls.' Reply at 15–17. In light of these various regulatory regimes, and based on the factors discussed above concerning the consultation histories and the presence of the species in most of the critical habitat units, defendants have concluded that vacatur of the critical habitat designations during the remand period will not compromise the conservation needs of the two species.[5] *See* Frazer Dec. ¶¶ 8, 15, 19, 21.

Intervenors, for their part, offer little evidence to rebut FWS's conclusion. At most they argue, echoing their challenge to FWS's interpretation of the significance of critical habitat designations, that even if federal action triggers consultations in occupied areas due to the presence of the species, those consultations will be conducted under a less rigorous standard than would be the case if critical habitat designations were in place. They also argue that critical habitat designation is necessary to trigger consultation in any unoccupied areas that are essential to species recovery.

These arguments are too abstract to have much weight. Intervenors have not identified any specific threat to the species or the designated critical habitat units (either in the occupied or unoccupied areas) over the short time frame during which new rules would be developed. Moreover, intervenors have certainly failed to identify any concrete threat to the habitat over the short term that will handled be ineffectively due to the fact that consultation will be conducted with reference to "jeopardy" to the species rather than with reference to "destruction or adverse modification of critical habitat." This case thus differs markedly from *Natural Resources Defense Council v. United States Dep't of Interior*, CV 99–5246, slip op. at 26 (C.D. Cal. June 11, 2002), in which the court had evidence of two large projects (as well as numerous applications for additional projects) that posed real dangers to the gnatcatcher habitat at issue during remand.

In assessing the "disruptive consequences" of vacatur, *see Allied–Signal*, 988 F.2d at 150–51, the Court cannot rely upon intervenors' abstract policy arguments; rather, there must be some factual basis for determining what the disruptive consequences might be. In light of FWS's considered and well-grounded position that

---

subject to very limited types of development. *Id.* FWS does not presently anticipate any impact to the unoccupied designated critical habitat, even during the lengthy remand period it proposes. *Id.*

**5.** In the final rules designating critical habitat, FWS had identified certain somewhat general and vague threats to the species and their habitats. *See, e.g.,* 66 Fed.Reg. at 9416, 66 Fed.Reg. at 29,385. FWS has apparently concluded, however, that those dangers would not pose real risks over the short term in the absence of critical habitat designations, given the other regulatory protections in place.

vacatur will not be detrimental, and given the overlapping regulatory structures that protect the species and their unique vernal pool and riparian habitats, the Court does not believe that the disruptive consequences of vacating the critical habitat designations will be significant.[6] Accordingly, the flawed rules, which may erroneously place regulatory burdens on plaintiffs and others, should not be allowed to stand. This analysis holds even with respect to the one unoccupied area designated as critical habitat, which, as noted in footnote 4 above, is peculiarly situated in a location partially designated for the protection of another species and at the edge of a major airport runway.

### III. Timing on Remand

■ Although the substantive nature of the defects and the minimal extent of likely disruptive consequences indicate that vacatur is warranted, the time period for designating new critical habitats should not be unbounded. FWS says that it requires two years to promulgate new regulations and asks that it be allowed to delay beginning work on the new rules until May 2003 and June 2003 for the fairy shrimp and arroyo toad, respectively, due to its high number of existing commitments and low level of resources.[7] Intervenors, on the other hand, argue that the Court should order only new economic analyses, and that FWS should be permitted just 100 days to complete these assesssments.

The right approach, the Court concludes, lies between these extremes.

As an initial matter, the Court disagrees with intervenors' contention that only new economic analyses are appropriate. As discussed above, the statutory language mandates an economic analysis and indicates that such an analysis should be an integral part of the process for designating specific areas as critical habitat. In addition, as FWS urged at the hearing, re-examining the entire critical habitat designations at this time would enable FWS to ensure that its assessments are based upon the "best scientific data available," and would allow FWS to consider objections raised to the initial designations by plaintiffs and intervenors. The Court will therefore not preclude FWS from reconsidering on remand whatever aspects of the critical habitat designations it deems appropriate.

On the other hand, the Court agrees with intervenors that the roughly 31–month (from this date) time frame proposed by FWS is too long. Even if FWS re-examines the critical habitat designations largely anew, it is reasonable to assume that FWS's earlier work on these issues will expedite its reconsideration. Thus it is reasonable to expect that FWS can complete its analyses and promulgate final regulations well within the 21 to 24 month time frame envisioned under 16 U.S.C. § 1533(b) for initial critical habitat

---

6. Intervenors point out that, following the vacatur of critical habitat designations for the pygmy owl in a different case, the U.S. Army Corps of Engineers withdrew a consultation request relating to an unoccupied area of the pygmy owl habitat. This fact is of little relevance to the instant case, where virtually all areas are occupied and where the particular consultation histories suggest the conservation needs of the species will not be compromised by vacatur. *See* Frazer Dec. ¶¶ 15, 21.

7. FWS had argued that its budgetary constraints prohibited it from carrying out additional designations of critical habitat during FY 2002. At the hearing, however, FWS explained that it would receive money for FY 2003 on October 1, 2002, a date which has now passed.

designations.[8] Moreover, the Court notes that if it were to allow FWS to delay beginning the designation process until the spring of 2003, new petitions for critical habitat designations filed in the interim would take precedence over this renewed review mandated by Court order.

Accordingly, despite FWS's resource allocation issues, the Court shall order that the proposed rules for new critical habitat designations for both species be completed within 21 months of the date of this decision. FWS may allocate those 21 months as it deems appropriate and as may be permissible under the APA and the ESA.

## CONCLUSION

The final rules designating critical habitat for the Riverside fairy shrimp and the arroyo southwestern toad shall be vacated and remanded for further consideration because the economic analyses were arbitrary, capricious, or otherwise not in accordance with law. Plaintiffs' complaint shall be dismissed because the rules plaintiffs challenge will no longer be in place.[9] FWS has 21 months from the date of this Court's accompanying order to promulgate new final rules for designating critical habitat for the two species.

A separate order has been issued on this date.

## *ORDER*

Upon consideration of Defendants' Motion to Vacate and Remand Critical Habitat Designations, the various submissions of the parties, the arguments of counsel at the hearing on August 30, 2002, and the entire record, it is, for the reasons stated in the Memorandum Opinion issued on this date, hereby

ORDERED that the Final Designation of Critical Habitat for the Arroyo Toad, 66 Fed.Reg. 9414 (February 7, 2001), and the Final Designation of Critical Habitat for the Riverside Fairy Shrimp, 66 Fed.Reg. 29,384 (May 30, 2001), are hereby VACATED; and it is further

ORDERED that the critical habitat designations for the arroyo southwestern toad and the Riverside fairy shrimp are hereby REMANDED to the United States Fish and Wildlife Service for reconsideration; and it is further

ORDERED that the United States Fish and Wildlife Service shall publish new final regulations with respect to the designations of critical habitat for the arroyo southwestern toad and the Riverside fairy

---

8. FWS has 90 days from the receipt of a petition for listing a species to determine whether to list (and thus whether to designate critical habitat for) the species. 16 U.S.C. § 1533(b)(3)(A). If the Secretary determines the petitioned action is warranted, he must publish proposed regulations within 12 months of receiving the petition. *Id.* § 1533(b)(3)(B)(ii). Within 12 months, thereafter, the final regulation shall be published. *Id.* § 1533(b)(6)(A). The Secretary may seek an additional 12 months to publish final regulations if the critical habitat is "not then determinable." *Id.* § 1533(b)(6)(C).

9. Defendants note that plaintiffs' third claim for relief, seeking a "judicial declaration concerning defendants' pattern and practice of failing to analyze economic impacts as required by the ESA" with respect to seventy-eight unnamed species, Compl. ¶ 69, would not necessarily be mooted by vacatur of the two critical habitat designations at issue. They argue, however, that plaintiffs have failed to meet the constitutional test for standing to pursue their third claim under *Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Because plaintiffs have failed to oppose defendants' motion to dismiss this case in its entirety, and in light of the Court's conclusion that the rules at issue should be vacated and that these matters should be remanded for further consideration by the agency, the Court will dismiss of plaintiffs' complaint at this time.

shrimp by no later than July 30, 2004; and it is further

ORDERED that plaintiffs' Complaint is hereby DISMISSED in its entirety.