**NATIONAL PARKS CONSERVATION ASSOCIATION, Plaintiff,**

v.

**S.M.R. JEWELL, Secretary of the United States Department of the Interior, et al., Defendants.**

**Civil Action No. 09–00115 (BJR)**

United States District Court, District of Columbia.

Signed February 20, 2014

Deborah M. Murray, Catherine Malina, Charlottesville, VA, for Plaintiff.

Mark Arthur Brown, Sr., Ruth Ann Storey, Brian Hamilton Lynk, U.S. Department of Justice, Washington, DC, for Defendants.

## MEMORANDUM DECISION

BARBARA J. ROTHSTEIN UNITED STATES DISTRICT JUDGE

### I. Introduction

In this case the plaintiff, National Parks Conservation Association ("NPCA"), an environmental group, challenges a final rule that governs the operation of coal mining activities near and through streams. The rule was published by the Office of Surface Mining Reclamation and Enforcement ("OSM") of the U.S. Department of the Interior ("DOI") and is entitled "Excess Spoil, Coal Mine Waste, and Buffers for Perennial and Intermittent Streams," 73 Fed.Reg. 75,814 (Dec. 12, 2008) (hereinafter "2008 Rule" or "Rule"). The 2008 Rule revised a stream protection rule that had been in effect since 1983 (the "1983 stream buffer zone rule"). *See* Stream Buffer Zone Rule, 48 Fed.Reg. 30,312 (June 30, 1983). The Environmental Protection Agency ("EPA") concurred in OSM's promulgation of the Rule. The plaintiff seeks to have the court invalidate the 2008 Rule. NPCA also seeks to have the court determine that a 1996 Biological Opinion issued by the Fish and Wildlife Service ("Service") is invalid and to order OSM to reinitiate formal consultation with the Service.

The defendants are S.M.R. Jewell, Secretary of the United States Department of the Interior, Joseph G. Pizarchik, Director of the Office of Surface Mining Reclamation and Enforcement, and Gina McCarthy, Administrator of the United States Environmental Protection Agency (collectively, the "Federal Defendants"). Additionally, the National Mining Association ("NMA") has intervened as a defendant in the case. NPCA alleges violations of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, section 7(a)(2) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a)(2), various provisions of the Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), 30 U.S.C. §§ 1201–1328, and sections 101 and 303 of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251, 1313.

This court's decision primarily analyzes NPCA's claims under the ESA. As to those claims, NPCA argues that OSM vio-

lated section 7(a)(2) of the ESA by not consulting with the Service prior to promulgating the 2008 Rule. NPCA also contends that it was arbitrary and capricious for OSM to rely on a 1996 Biological Opinion to avoid its consultation duties and that OSM violated its ESA section 7 duties by not reinitiating with the Service. NPCA asks that the court vacate the 2008 Rule and the 1996 Biological Opinion and remand the matter to OSM. The Federal Defendants admit that it was legal error for OSM not to initiate consultation on the 2008 Rule and they request that the court vacate the 2008 Rule on that basis. *See* Answer (Dkt. No. 40) at ¶¶ 6, 59, 61–62. The Federal Defendants argue that the plaintiff's claim regarding OSM's reliance on the 1996 Biological Opinion should be dismissed as moot and that the plaintiff's remaining challenges to the 1996 Biological Opinion should be denied because the court lacks jurisdiction to consider them. NMA argues that OSM was not required to consult on the 2008 Rule and that even if consultation was required, the Rule should not be vacated.

Before the court is a series of cross-motions for summary judgment filed by NPCA and the Federal Defendants. NMA has filed oppositions and replies to these motions for summary judgment.

## II. Background

### A. Surface Coal Mining

To reach coal that is buried below soil and rock, coal mine operators drill, blast, or use bulldozers to fracture the underlying rock. Administrative Record ("AR") at SBZ000125.[1] The operators then remove the broken rock, which is known as "spoil." *Id.* The broken rock that was once compact takes up much more space once it has been excavated. *Id.* As a result, in areas with steep slopes, coal mine operators may not be able to return all of the spoil to the mined area in a stable manner. AR at SBZ000011. When that happens, some "excess spoil" may be placed in the upper reaches of valleys adjacent to the mined areas. *Id.*; *see also* AR at SBZ000003. This is known as a "valley fill." AR at SBZ000003, SBZ000195. These steep-slope valleys often have streams running through them and a valley fill buries the upper reaches of such streams. AR at SBZ000011. Valley fills are also associated with downstream effects on surface–water chemistry and macroinvertebrate communities. AR at SBZ000277. The placement of excess spoil in stream channels occurs primarily in the central Appalachian coal fields. AR at SBZ000266.

### B. Statutory and Regulatory Framework

### (1) The Surface Mining Control and Reclamation Act of 1977 and the Stream Buffer Zone Rule

The SMCRA, which has as one of its purposes to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations," *see* 30 U.S.C. § 1202(a), does not require a buffer zone around streams.[2] AR at SBZ000004. Nevertheless, since the initial regulatory program under the SMCRA, OSM has provided for a 100–foot buffer zone around streams, with variances allowing for the disposal of excess spoil within the buffer

---

1. Citations to the Administrative Record of the Department of the Interior refer to Bates numbers that start with "SBZ."

2. OSM is the office in charge of administering and enforcing the SMCRA on behalf of the Secretary of the Interior. 30 U.S.C. § 1211(c).

zone under certain circumstances.[3] *See* AR at SBZ000004–05.

A state can obtain primary jurisdiction ("primacy") over the regulation of surface coal mining and reclamation operations within its borders by submitting a program proposal to the Secretary of the Interior that meets or exceeds the minimum requirements of the SMCRA and that is approved by OSM. 30 U.S.C. § 1253. In those states that do not obtain primacy, OSM operates a federal regulatory program. 30 U.S.C. § 1254.

### (2) Section 7(a)(2) of the Endangered Species Act

■ Section 7(a)(2) of the Endangered Species Act requires "[e]ach Federal agency," in consultation with the appropriate wildlife agency, to "insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'agency action') is not likely to jeopardize the continued existence of any endangered species or threatened species" or adversely modify a species' critical habitat. 16 U.S.C. § 1536(a)(2). When a federal agency's proposed discretionary action "may affect listed species or critical habi-

tat," the agency must initiate formal consultation with the Service or the National Marine Fisheries Service ("NMFS").[4] 50 C.F.R. §§ 402.03, 402.14(a). There are two exceptions: if preparation of a biological assessment or informal consultation shows that the agency action is not likely to adversely affect listed species or critical habitat, then the agency need not initiate formal consultation.[5] 50 C.F.R. § 402.14(a)–(b); *see also Am. Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027, 1034 (D.C.Cir.2008). All of this means that an agency avoids the consultation requirement for a proposed discretionary action only if it determines that its action will have "no effect" on threatened or endangered species or critical habitat.[6] *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 475 (D.C.Cir.2009) ("If the agency determines that its action will not affect any listed species or critical habitat, ... then it is not required to consult with NMFS or Fish and Wildlife.").

■ The "may affect" threshold for triggering the consultation duty under section 7(a)(2) is low. *See Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th

---

**3.** A buffer zone is an undisturbed area between a stream and coal mining operations. *See* AR at SBZ000336.

**4.** The NMFS (with respect to marine species) and the Service (for other species) share responsibility for administering the ESA. *See* 50 C.F.R. § 402.01(b); Interagency Cooperation—Endangered Species Act of 1973, 51 Fed.Reg. 19926, 19926 (June 3, 1986).

**5.** Informal consultation is "an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency or the designated non—Federal representative, designed to assist the Federal agency in determining whether formal consultation or a conference is required." 50 C.F.R. § 402.13(a). A biological assessment evaluates the potential effects of the action on

listed species and critical habitat. 50 C.F.R. § 402.12(a).

**6.** NMA asserts that the ESA section 7 rules are not binding on other agencies, because the "structure" of section 7 indicates that Congress has not delegated to the Service the authority to issue rules binding on other federal agencies. NMA states that the structure of section 7 "places the federal agencies in charge of ESA compliance and gives the Services only a 'consultation' role." NMA's Mem. in Opp. (Dkt. No. 57) at 20. But NMA misconstrues the issue in this case. The issue is not whether the Service can require OSM to initiate consultation; rather, the issue is whether OSM's own "no effect" determination—and its concomitant decision that consultation was not required—was arbitrary and capricious.

Cir.2012) (en banc) ("[A]ctions that have any chance of affecting listed species or critical habitat—even if it is later determined that the actions are 'not likely' to do so—require at least some consultation under the ESA."). "Any possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement." Interagency Cooperation—Endangered Species Act of 1973, 51 Fed.Reg. 19926, 19949–50 (June 3, 1986). After an agency engages in the formal consultation process, the Service or the NMFS issues a biological opinion which advises the agency whether jeopardy is likely to occur for a listed species or its habitat and, if so, whether "reasonable and prudent alternatives" exist to avoid a jeopardy situation. 50 C.F.R. § 402.14(h)(3). In some instances, reinitiation of consultation may be required. 50 C.F.R. § 402.16.

### C. The 1996 Biological Opinion

On March 21, 1995, OSM requested formal consultation regarding its existing surface coal mining and reclamation operations under state and federal regulatory programs adopted pursuant to the SMCRA and its implementing regulations. *See* AR at SBZ037387. In response, on September 24, 1996, the Service issued a Biological Opinion. AR at SBZ037389—SBZ037401. The 1996 Biological Opinion is a comprehensive biological opinion "that addresses all present and future Federally listed and proposed species and designated or proposed critical habitats that may be affected by the implementation and administration of surface coal mining regulatory programs under SMCRA." AR at SBZ037392. The Service concluded that "surface coal mining and reclamation oper-

ations conducted in accordance with properly implemented Federal and State regulatory programs under SMCRA are not likely to jeopardize the continued existence of listed or proposed species, and are not likely to result in the destruction or adverse modification of designated or proposed critical habitats." AR at SBZ037396. This determination is referred to by the parties as the "no jeopardy" determination.

### D. The 2008 Stream Buffer Zone Rule and the "No Effect" Determination

The 2008 Rule being challenged in this case revised the 1983 stream buffer zone rule. *See* 73 Fed.Reg. 75,814 (AR at SBZ000001—73). The 2008 Rule retains the buffer zone requirement, but establishes different criteria than those in the 1983 Rule for obtaining a waiver of the stream buffer zone requirement. *See* 30 C.F.R. §§ 816.57(a); 817.57(a) (2013). In promulgating the 2008 Rule, OSM determined that the 2008 Rule would have no effect on listed species or critical habitat, and therefore did not initiate consultation with the Service. *See* AR at SBZ001792. OSM relied on the 1996 no jeopardy decision to reach this "no effect" conclusion. *See* AR at SBZ000281–84.

### E. Factual and Procedural Background

#### (1) The Federal Defendants' Concession of Error and Motion for Voluntary Remand and Vacatur

At the outset of this case, the Federal Defendants filed a motion conceding legal deficiencies in the rulemaking and requesting the court to vacate the 2008 Rule and remand the matter to OSM.[7] Fed. Defs.' Mtn. for Voluntary Remand and Vacatur (Dkt. No. 10). Judge Henry H. Kennedy,

---

**7.** The Federal Defendants do not concede that *formal* consultation was required, only that some form of consultation was required. *See*

Fed. Defs.' Mtn. for Partial Summary Judgment (Dkt. No. 43–1) at 24.

Jr., denied the motion, finding that it was not appropriate to vacate the Rule when there had not been a determination of the merits of the plaintiff's challenge.[8] *See Nat'l Parks Conservation Ass'n v. Salazar,* 660 F.Supp.2d 3, 4 (D.D.C.2009) (Kennedy, J.). The court concluded:

> While notice and comment procedure is not required where a court vacates a rule after making a finding on the merits, *see, e.g., Cement Kiln Recycling Coal. v. EPA,* 255 F.3d 855, 872 (D.C.Cir.2001), granting vacatur here would allow the Federal defendants to do what they cannot do under the APA, repeal a rule without public notice and comment, without judicial consideration of the merits.

*Id.* at 5. In response to the pending motions for summary judgment, NMA urges the court to avoid considering the merits of NPCA's claims and instead to remand the 2008 Rule without vacatur. *See* NMA's Mem. in Response to Fed. Defs.' Mtn. for Partial Summary Judgment ("NMA's Resp.") (Dkt. No. 46) at 13; NMA's Mem. in Opp. to Pl.'s Mtn. for Partial Summary Judgment ("NMA's Opp.") (Dkt. No. 57) at 17. NMA argues that remand without vacatur would be consistent with Judge Kennedy's decision in this case and would also be consistent with another case in this Circuit, *Carpenters Industrial Council v. Salazar,* 734 F.Supp.2d 126 (D.D.C.2010), *appeal dismissed,* No. 10–5417, 2011 WL 812391 (D.C.Cir. Feb. 24, 2011).

The court respects NMA's arguments. However, the present posture of this case renders it distinguishable from *Carpenters Industrial Council.* In that case, the federal defendants confessed legal error and requested voluntary vacatur of a critical habitat designation. *Carpenters Indus.*

*Council,* 734 F.Supp.2d at 135. The court concluded that it lacked the authority to vacate the critical habitat designation because it had not made a determination of the merits. *Id.* at 136. But that is not the situation here. The court now has before it the full administrative record, as well as fully briefed cross-motions for summary judgment. The court is, therefore, able to undertake a determination of the merits. As a result, it would not be inconsistent with Judge Kennedy's decision or *Carpenters Industrial Council* for the court to vacate the rule should it determine that vacatur is warranted.

### III. Analysis

NPCA makes two claims related to OSM's failure to consult on the 2008 Rule. First, NPCA alleges that OSM's failure to consult with the Service violated the ESA. Second, NPCA alleges that OSM's reliance on the 1996 Biological Opinion to avoid consultation on the 2008 Rule was arbitrary and capricious.

### A. Standard of Review

 NPCA brings these claims pursuant to the ESA's citizen suit provision, 16 U.S.C. § 1540(g)(1), the APA, 5 U.S.C. § 706, and the SMCRA, 30 U.S.C. § 1276. Am. Compl. (Dkt. No. 6) at ¶¶ 61–62; 67–68. The standards provided in the APA govern judicial review of agency decisions under the ESA. *Cabinet Mountains Wilderness v. Peterson,* 685 F.2d 678, 686 (D.C.Cir.1982) ("[T]he appropriate standard of review under the ESA is the arbitrary and capricious standard provided by the APA."); *see also Defenders of Wildlife v. Jackson,* 791 F.Supp.2d 96, 106 (D.D.C. 2011). The APA instructs the reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found

---

8. The case was reassigned to the presiding Judge on December 15, 2011. *See* Docket

Entry dated December 15, 2011.

to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Similarly, the SMCRA provides: "Any action subject to judicial review under this subsection shall be affirmed unless the court concludes that such action is arbitrary, capricious, or otherwise inconsistent with law." 30 U.S.C. § 1276(a)(1). The "arbitrary and capricious" standard of review presumes that the agency's action is valid. *Envtl. Def. Fund, Inc. v. Costle,* 657 F.2d 275, 283 (D.C.Cir.1981).

■■■ In making the arbitrary and capricious determination, the court reviews the administrative record already in existence, *see Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973), basing its review on the documents that were before the agency at the time of its decision. *IMS, P.C. v. Alvarez,* 129 F.3d 618, 623 (D.C.Cir.1997). Although the court must undertake a "searching and careful" inquiry into the facts, the standard of review is narrow, and "[t]he court is not empowered to substitute its judgment for that of the agency." *Citizens to Pres. Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971), *abrogated on other grounds by Califano v. Sanders,* 430 U.S. 99, 104, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977). Instead, the court is "principally concerned with ensuring that [the Agency] has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made,' that the Agency's 'decision was based on a consideration of the relevant factors,' and that the Agency has made no 'clear error of judgment.' "

*Bluewater Network v. EPA,* 370 F.3d 1, 11 (D.C.Cir.2004) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983)). In addition, "[s]ummary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record ... even though the Court does not employ the standard of review set forth in Rule 56, Fed.R.Civ.P." *Fund for Animals v. Babbitt,* 903 F.Supp. 96, 105 (D.D.C.1995) (internal citation omitted) *amended on other grounds,* 967 F.Supp. 6 (D.D.C.1997).

## B. OSM's "No Effect" Determination Was Arbitrary and Capricious, and Therefore its Failure to Consult with the Service Violated the ESA

■■■ The record is clear that the 2008 Rule "may affect" threatened or endangered species or critical habitat.[9] First, threatened and endangered species exist in areas where coal mining occurs. In the final Environmental Impact Statement ("EIS"), OSM explained that sixteen federally listed and endangered species of mussels occur in Appalachia. AR at SBZ000278.

Second, mining operations affect the habitat and species residing in their paths. OSM generally described these effects as follows:

Direct effects of surface coal mining and reclamation operations on threatened, endangered, or proposed species or critical habitat consists [sic] primarily of habitat alteration by land clearing and

---

**9.** The parties do not dispute that OSM's promulgation of the 2008 Rule is an agency "action" within the meaning of section 7(a)(2) of the ESA, which defines "agency action" as "any action authorized, funded, or carried out by such agency." 16 U.S.C. § 1536(a)(2); *see*

*also* Fed. Defs.' Mtn. for Partial Summary Judgment at 22; Pl.'s Mtn. for Partial Summary Judgment (Dkt. No. 48–1) at 19. The regulations implementing the ESA provide that "action" includes "the promulgation of regulations." 50 C.F.R. § 402.02.

earthmoving operations. While some of these effects are temporary, unique habitat features in such microenvironments as cliffs, caves, rock outcroppings, seeps, and old-growth forests are difficult and sometimes impossible to replace.... Aquatic and wetland-dependent species also may be directly affected by adverse impacts on water availability and quality (e.g. increased levels of metals, sulfates, and dissolved or suspended solids), increased variations of streamflow and thermal gradients, and changes in ground water levels and spring flows. If a species of concern lacks individual mobility, land clearing and excavation activities may result in a direct take. Direct effects are often readily identifiable, but the magnitude of incidental take resulting from both direct and indirect effects is difficult to ascertain and not well-documented.

AR at SBZ000281. The record also sets forth more specific effects on threatened and endangered species posed by coal mining operations. For example, "several studies have found a relationship between coal-related contaminants and toxicity to mussels." AR at SBZ000278. Another threat to mussels from coal mining is blackwater releases from coal processing plants. *Id.* In addition, as quoted above, OSM specifically noted that if a species "lacks individual mobility"—a phrase that

aptly describes mussels—"land clearing and excavation activities may result in a direct take." [10] AR at SBZ000281. Moreover, it was clear to OSM that "riparian buffer zones are important terrestrial habitats." AR at SBZ000279. With respect to valley fills, OSM recognized that "[w]hen streams are filled or mined through[,] all biota living in the footprint of the fill or in the mined area are lost." AR at SBZ000273.

Third, the 2008 Rule adopts different criteria than the 1983 Rule for permitting mining activities in the stream buffer zone and in and through streams.[11] This means that the 2008 Rule may lead to more, or at least, different sorts of, incursions into the stream buffer zone than the 1983 Rule, thereby potentially affecting listed species or critical habitat. For example, the 1983 Rule allowed mining activities in the buffer zone only upon a finding by the regulatory authority that the mining activities "will not cause or contribute to the violation of applicable State or Federal water quality standards, and will not adversely affect the water quantity and quality or other environmental resources of the stream." 30 C.F.R. §§ 816.57(a), 817.57(a) (2008).[12] The 2008 Rule removes these two criteria related to water quality. 30 C.F.R. §§ 816.57(a), 817.57(a) (2013); *see also* AR at SBZ000006 (preamble to final rule). In-

---

10. To "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

11. NMA argues that OSM's "no effect" determination was reasonable because the 2008 Rule does not "dictate" that coal mining activities occur near listed species or critical habitat, but instead provides considerations for "deciding *at a later time* whether to permit specific surface coal mining operations." NMA's Opp. at 22. This argument incorrectly presumes that the consultation requirement kicks in only if the proposed action *will* affect

these species and habitat. But the correct threshold for triggering consultation is whether the action *may* affect the listed species or critical habitat.

12. The regulations relating to the stream buffer zone requirement and its exceptions are divided between regulations addressing surface mining activities (Part 816 and Part 780) and those addressing underground mining activities (Part 817 and Part 784). The environmental standards related to stream protection are the same for both surface mining (sections 780.28 and 816.57) and underground mining (sections 784.28 and 817.57).

stead, under the 2008 Rule, "the permit application must demonstrate, and the regulatory authority must find, that avoiding disturbance of the stream is either not reasonably possible or not necessary to meet the fish and wildlife and hydrologic balance protection provisions of the regulatory program." AR at SBZ000025 (preamble to final rule); see also 30 C.F.R. §§ 816.57(a), 817.57(a), 780.28(e); 784.28(e) (2013). In addition, the 2008 Rule provides exceptions to the buffer zone requirement for certain mining activities, including the diversion of streams and the construction of excess spoil fills, as long as the regulatory authority finds that "avoiding disturbance of the stream is not reasonably possible." AR at SBZ000025.

OSM itself has acknowledged that the 2008 Rule establishes different standards than the 1983 Rule for allowing mining activities within the stream buffer zone. In the final EIS and the preamble to the final Rule, OSM repeatedly stated that the revisions to the 1983 stream buffer zone rule encompassed by Alternative 1, the alternative that became the 2008 Rule, would have positive effects on the environment as compared to the 1983 Rule. See AR at SBZ000063 (preamble to the final rule) ("Alternative 1 is uniquely different from the other alternatives in that it incorporates changes to reduce the adverse impacts of coal mine waste disposal facilities . . . on fish, wildlife, and related environmental values. We anticipate that these changes would positively impact the environment."); AR at SBZ000280 (final EIS) ("Alternative 1 would also require more rigorous environmental analyses of placement of coal waste coupled with existing regulations. This should have a slightly positive effect on terrestrial fauna."); AR at SBZ000119–20 (final EIS) ("Coupled with the changes in excess spoil regulations, Alternative 1 would result in slight positive effects on the human environment with respect to direct hydrologic impacts, water quality, and aquatic fauna when compared to the 'no action' alternative."). It does not matter if the changes OSM expected after implementing the 2008 Rule are deemed less protective or more protective; what matters is that the 2008 Rule established different standards for allowing mining activities within the stream buffer zone as compared to the 1983 Rule. Due to these changes, the 2008 Rule had the potential for different effects on species and the environment than the 1983 Rule.

Faced with clear evidence that habitats within stream buffer zones are home to threatened and endangered species and that mining operations affect the environment, water quality, and all living biota, OSM's determination that the revisions to the stream protection rule encompassed by the 2008 Rule would have no effect on threatened and endangered species or critical habitat was not a rational conclusion.[13]

13. NMA argues that a 2008 memorandum in the record, see AR at SBZ000349, demonstrates that there was a rational basis for OSM's decision not to initiate ESA consultation on the 2008 Rule. See NMA's Supp. Br. on ESA Claims (Dkt. No. 73) at 4. That document is entitled "Summary of Consultation and Coordination with Other Agencies" and states that in September 2006, the "FWS and the Office of the Solicitor agreed that the proposed rule would not have any effect on threatened or endangered species and that therefore, there was no need to initiate consultation under Section 7 of the Endangered Species Act." AR at SBZ000349. However, no party asserts that this discussion between OSM and the Service satisfies OSM's consultation duties. Moreover, the regulations provide that an agency can avoid formal consultation by engaging in informal consultation with the Service only if, as a result of the informal consultation, "the Federal agency determines, with the *written concurrence* of [the Service], that the proposed action is not likely to adversely affect any listed species or

"[T]he record belies the agency's conclusion" of no effect, so the court "must undo [OSM's] action." *Cnty. of Los Angeles v. Shalala,* 192 F.3d 1005, 1021 (D.C.Cir. 1999). Because the 2008 Rule "may affect" threatened and endangered species and critical habitat, OSM was required to initiate consultation on the 2008 Rule. OSM's failure to do so was a violation of section 7(a)(2) of the ESA.

### C. OSM's Reliance on the 1996 Biological Opinion to Avoid Consultation was Arbitrary and Capricious

██ OSM's "no effect" determination was a result of OSM's reliance on the 1996 Biological Opinion. *See* AR at SBZ000281, SBZ000283–84. In the 1996 Biological Opinion, the Service identified a list of regulations "as pertinent to the protection of fish, wildlife, and related environmental values." AR at SBZ000281. The Service determined that compliance with those regulations would ensure that continuation and approval of mining operations conducted under the SMCRA would not likely jeopardize the continued existence of any threatened, endangered, or proposed species or result in adverse modification of designated or proposed critical habitat. AR at SBZ000283, SBZ037396. In promulgating the 2008 Rule, OSM reasoned that because the 2008 Rule did not alter any of those protective provisions, the Rule would have no effect on listed species and critical habitat. AR at SBZ000283 (final EIS). In response to a comment that even positive effects from the proposed Rule were enough to trigger section 7(a)(2) consultation, OSM spelled out how the 1996 Biological Opinion allowed it to avoid consultation, stating:

> [O]ur existing regulations contain extensive provisions that the U.S. Fish and

Wildlife Service, in a 1996 biological opinion, found adequate to protect threatened and endangered (T & E) species and their habitat. The biological opinion did not include the stream buffer zone rule as one of those provisions. None of the alternatives under consideration in this EIS would alter any of the regulations listed in the biological opinion. Therefore, contrary to our statement in the DEIS, we no longer believe that Alternatives 1, 2, and 3 would have a slightly positive effect on T & E species. Instead, we anticipate that none of the action alternatives would have any effect on T & E species.... Therefore, there is no need to initiate formal consultation under Section 7 of the Endangered Species Act.

AR at SBZ001792 (final EIS) (emphasis omitted).

At this point, only NMA argues that this reliance was reasonable. NPCA argues that this reliance was arbitrary and capricious. For their part, the Federal Defendants acknowledge that OSM was wrong to rely on existing regulations to avoid consultation. *See* Fed. Defs.' Mtn. for Partial Summary Judgment at 22 ("Instead of considering the on-the-ground direct and indirect effects of the agency action—*i.e.,* the [2008] Rule—OSM *erroneously relied* on other preexisting regulations to support its conclusion that there would be no effects on threatened and endangered species or critical habitat from this action.") (emphasis added). But the Federal Defendants contend that NPCA's claim that this reliance was arbitrary and capricious (Count III) should be dismissed as moot. *Id.* at 37.

critical habitat." 50 C.F.R. § 402.14(b)(1) (emphasis added). There is no such written

concurrence in the record.

Count III, the reliance claim, is clearly not moot. OSM's reliance on the 1996 Biological Opinion's "no jeopardy" decision is the basis for OSM's conclusion that the 2008 Rule did not require consultation under section 7 of the Endangered Species Act. The court cannot fully address whether OSM's "no effect" determination was arbitrary and capricious without taking up OSM's reasons for not consulting on the 2008 Rule. Even though NPCA presented the consultation claim and the reliance claim as two separate counts in its amended complaint, this is an artificial distinction, because they are really part of the same claim that consultation was required.

Turning to the merits, the court concludes that OSM's reliance on the 1996 Biological Opinion was arbitrary and capricious because, quite obviously, the 1996 Biological Opinion did not consider and could not have considered the effects of the 2008 Rule on threatened and endangered species and critical habitat. To clarify, the Service's "no jeopardy" conclusion in the 1996 Biological Opinion was reached after reviewing the SMCRA and "its implementing regulations." AR at SBZ037396. At that time, the SMCRA's "implementing regulations" included the 1983 stream buffer zone rule. Therefore, although the 1996 Biological Opinion does not specifically point to compliance with the 1983 Rule as forming the basis for its "no jeopardy" conclusion, that stream buffer zone rule was one of the provisions that the Service considered in reaching its "no jeopardy" conclusion. But the 2008 Rule *changes* that 1983 Rule, and therefore, changes one of the grounds on which the

1996 Biological Opinion's "no jeopardy" conclusion is based. It follows that the 1996 Biological Opinion cannot provide a rational basis for avoiding consultation on the 2008 Rule. The 1996 Biological Opinion simply did not consider the 2008 Rule in reaching its "no jeopardy" conclusion. Reliance on the 1996 Biological Opinion was arbitrary and capricious.

Furthermore, the 1996 Biological Opinion did not consider new information on the impacts of coal mining on streams and aquatic life that post–1996 scientific research revealed. OSM was fully aware of this research, because OSM discussed it in both the final EIS for the 2008 Rule, *see* AR at SBZ000098–346 and SBZ000351–1869, and in a 2005 Programmatic Environmental Impact Statement (PEIS) that evaluated the adverse environmental impacts of mountaintop mining operations and excess spoil valley fills (MTM/VF) in Appalachia.[14] *See* AR at SBZ030644–SBZ031150. Several examples of studies demonstrate that new scientific information was reported after issuance of the 1996 Biological Opinion. Post–1996 research studies found that coal mining and excess spoil fill construction are associated with downstream changes in surface-water chemistry, including increased concentrations of selenium.[15] *See* AR at SBZ000277; *see also* AR at SBZ030685, SBZ030687, SBZ030753–55; AR at SBZ031263, SBZ033352. A 2001 study analyzing stream temperature discovered that the temperature of a stream below a valley fill site had lower daily fluctuations and less seasonal variation than the temperature of a stream below an unmined site.[16] AR at

---

**14.** OSM issued the draft PEIS and final PEIS along with four other federal agencies. AR at SBZ030647. The 2005 MTM/VF final PEIS incorporates by reference the 2003 MTM/VF draft PEIS. *Id.*

**15.** In the final EIS, OSM noted that "[e]levated selenium concentrations may impact

aquatic biota and possibly higher order organisms that feed on aquatic organisms." AR at SBZ000277.

**16.** In discussing this study in the final EIS, OSM explained that the "heating up of a stream reduces the oxygen carrying capacity

SBZ000276. Another study found that the total number of fish species was "dramatically lower" in sites associated with valley fills. AR at SBZ031263–64 (discussed in the MTM/VF draft PEIS at SBZ032754). Other research found that between 1992 and 2002, approximately 1,200 miles of headwater streams in Appalachia had been directly impacted by coal mining activities such as valley fills, coal removal areas, roads and ponds. AR at SBZ030650. The 1996 Biological Opinion could not have taken into account these cumulative impacts of coal mining that occurred after 1996.

After going over much of this research in the final EIS, OSM then disregarded it entirely by relying on the 1996 Biological Opinion to determine the potential effect of the 2008 Rule on listed species and critical habitat. Ignoring these more recent findings about the impacts of coal mining and instead relying on an analysis from 12 years prior was arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43, 103 S.Ct. at 2867 ("Normally, an agency rule would be arbitrary and capricious if the agency ... entirely failed to consider an important aspect of the problem." (internal quotation marks omitted)).

### D. The Appropriate Remedy is to Vacate the 2008 Rule

Having determined that OSM's decision not to consult on the 2008 Rule was contrary to law, the court now turns to the appropriate remedy. NPCA and the Federal Defendants request that the 2008 Rule be vacated. NMA argues that the court should remand the 2008 Rule to OSM with instructions to initiate consultation.

 The APA governs the remedy for NPCA's ESA claims, providing that the "reviewing court shall ... hold unlaw-

ful and set aside agency action" found to be arbitrary and capricious or unlawful. 5 U.S.C. § 706(2)(A). As NMA points out, the court has discretion to remand without vacatur. *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C.Cir.2005). The decision whether to vacate depends on two factors: first, "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)" and second, "the disruptive consequences of an interim change that may itself be changed." *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C.Cir.1993) (quoting *Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 967 (D.C.Cir.1990)) (internal quotation marks omitted). Moreover, remand without vacatur is appropriate where "there is at least a serious possibility that the [agency] will be able to substantiate its decision on remand." *Allied–Signal, Inc.*, 988 F.2d at 151; *see also Milk Train, Inc. v. Veneman*, 310 F.3d 747, 756 (D.C.Cir. 2002) (describing it as "a factor that favors remanding rather than vacating.").

 The court is convinced that OSM's failure to initiate ESA section 7 consultation is a serious deficiency and not merely "a strictly procedural defect," as NMA argues. NMA's Opp. at 30. Section 7(a)(2) of the ESA contains both a procedural requirement to pursue consultation with the Service and a substantive requirement to ensure that the proposed agency action is not likely to jeopardize the continued existence of an endangered or threatened species or adversely affect critical habitat. *See Defenders of Wildlife v. Jackson*, 791 F.Supp.2d 96, 112–13 (D.D.C.2011) ("It is clear that § 7(a)(2) of the ESA contains *both* a substantive *and* procedural require-

---

of the waterway, harming stream life that is temperature–sensitive." SBZ000276.

ment."). The Supreme Court has cautioned that "Congress intended endangered species to be afforded the highest of priorities." *Tenn. Valley Auth. v. Hill,* 437 U.S. 153, 174, 98 S.Ct. 2279, 2292, 57 L.Ed.2d 117 (1978). Absent consultation with the Service, there is no confirmation that the 2008 Rule would avoid jeopardizing threatened or endangered species or adversely modifying critical habitat.[17] *See Bldg. Indus. Legal Def. Found. v. Norton,* 231 F.Supp.2d 100, 105 (D.D.C.2002) (vacating critical habitat designation where agency's error was a serious substantive error and not merely a procedural flaw). In addition, here there is no "serious possibility" that OSM would be able to develop a reasoned explanation on remand, because OSM has confessed legal error. *See Allied–Signal, Inc.,* 988 F.2d at 151.

As to the second part of the test, the Federal Defendants and NPCA have shown that vacating the 2008 Rule will have limited disruptive consequences. Vacatur would result in the reinstatement of the 1984 Rule, which governed surface mining activities for over 25 years and with which the regulated community is familiar. *See Envtl. Def. v. Leavitt,* 329 F.Supp.2d 55, 64 (D.D.C.2004) ("When a court vacates an agency's rules, the vacatur restores the status quo before the invalid rule took effect." (citing *Indep. U.S. Tanker Owners Comm. v. Dole,* 809 F.2d 847, 854 (D.C.Cir.1987)); *see also Humane*

*Soc'y of U.S. v. Kempthorne,* 579 F.Supp.2d 7, 21 (D.D.C.2008) ("Little confusion or inefficiency will result from reinstating a regulatory regime that was in place from 1978 to 2007."). So far, the 2008 Rule is effective only on those lands where OSM is the regulatory authority. *See Declaration of OSM Director Joseph G. Pizarchik* (Dkt. No. 43–4) ("*Pizarchik Decl.*") at ¶ 17. This means that the 2008 Rule became effective on Indian lands in all states and on all lands in the states of Arizona, California, Georgia, Idaho, Massachusetts, Michigan, North Carolina, Oregon, Rhode Island, South Dakota, Tennessee and Washington. *Id.* OSM has concluded that vacating the 2008 Rule would not have disruptive consequences on those lands for several reasons. First, mining on Indian lands occurs almost exclusively in arid regions with very few streams. *Pizarchik Decl.* ¶ 17. In addition, of the states listed above, only Tennessee contains mines that are actively producing coal, and the amount of coal mined in Tennessee amounts to less than 0.1% of the total tonnage of coal mined nationally.[18] *Id.* The Federal Defendants also assert that Tennessee historically has "been reluctant to approve operations that propose to fill or mine through perennial or intermittent streams." *Id.*

On all other lands—meaning those lands for which the state is the approved regulatory authority—the 2008 Rule is not yet

---

**17.** NMA argues that the 2008 Rule could be retained in effect pending ESA consultation in accordance with ESA section 7(d), which provides:

> After initiation of consultation required under subsection (a)(2) of this section, the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and pru-

dent alternative measures which would not violate subsection (a)(2) of this section. 16 U.S.C. § 1536(d). But it is mere speculation on the part of NMA that the 2008 Rule does not cross the "Section 7(d) threshold." NMA's Resp. at 15–17.

**18.** While NPCA agrees that vacatur would not be disruptive, it disagrees with any suggestion by the Federal Defendants that the 2008 Rule has not had harmful effects on Tennessee's watersheds and aquatic ecosystems. Pl.'s Mtn. for Partial Summary Judgment at 29.

effective. Therefore, vacating the Rule would not be disruptive. . This is because no state with an approved regulatory program has amended its program to reflect the 2008 Rule. *See Pizarchik Decl.* at ¶ 18. Moreover, it may be more disruptive to retain the 2008 Rule in effect. OSM is in the process of developing a new stream protection rule and it would be unnecessarily costly and burdensome for OSM to administratively withdraw the 2008 Rule through notice-and-comment procedures when OSM is already working on a new rule to replace the 2008 Rule. *See Pizarchik Decl.* at ¶¶ 19–26.

NMA argues that vacating the 2008 Rule will undo the clarification of the scope of the stream buffer zone rule that the 2008 Rule was intended to provide, "and return the regulatory program to its previous confused and uncertain state." NMA's Opp. at 32. But this is just an abstract policy argument and is not adequate to rebut the Federal Defendants' showing that vacatur of the 2008 Rule will not have disruptive consequences. *See Bldg. Indus. Legal Def. Found.,* 231 F.Supp.2d at 106 ("In assessing the 'disruptive consequences' of vacatur, *see Allied—Signal,* 988 F.2d at 150–51, the Court cannot rely upon intervenors' abstract policy arguments; rather, there must be some factual basis for determining what the disruptive consequences might be."). Accordingly, the court finds that vacatur of the 2008 Rule is warranted.

### E. NPCA's Remaining Claims

Because the 2008 Rule is being set aside, NPCA's remaining claims challeng-

ing the promulgation of that Rule are moot. *See Alabama Power Co. v. EPA,* 40 F.3d 450, 456 (D.C.Cir.1994) (declining to address a claim that was rendered moot by the court's vacatur of the agency's rule). These claims are that the 2008 Rule violates the environmental protection standards of the SMCRA (Count I), that EPA's concurrence in the 2008 Rule violates section 501 of the SMCRA (Count VI), and that EPA's failure to consult with the Service before issuing its written concurrence violates its duties under the ESA (Count VII).[19] Count V has already been dismissed. *See Minute Order* (Sept. 12, 2013).

Moreover, the court has found that OSM's reliance on the 1996 Biological Opinion as a reason for not consulting on the 2008 Rule was arbitrary and capricious. Given this ruling, the court does not find it necessary to address Count IV.[20]

### IV. Conclusion

For all of these reasons, NPCA's and the Federal Defendants' motions for summary judgment are granted in part and denied in part. The court vacates the 2008 Rule and remands the matter to OSM for further proceedings consistent with this decision. A separate order follows.

---

**19.** Section 501 of the SMCRA, the basis for Count VI, provides that OSM must obtain the written concurrence of the EPA "with respect to those regulations promulgated under this section which relate to air or water quality standards promulgated under the authority of the Federal Water Pollution Control Act, as amended [33 U.S.C. § 1251 et seq.]; and the

Clean Air Act, as amended [42 U.S.C. § 7401 et seq.][.]" 30 U.S.C. § 1251(a)(B).

**20.** In Count IV, the plaintiffs allege that OSM's failure to reinitiate consultation renders the 1996 Biological Opinion invalid under the ESA.